IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 20, 2010

## SCOTT CAMPBELL, ET AL. v. WILLIAM H. TEAGUE, ET AL.

**Direct Appeal from the Chancery Court for Henderson County**
**No. 18534      James F. Butler, Chancellor**

_____

**No. W2009-00529-COA-R3-CV - Filed March 31, 2010**

_____

This is a construction case.  Appellants/Builders appeal the trial court's award of damages to Appellees/Homeowners pursuant to the Tennessee Consumer Protection Act, and arising from Appellants/Builders' breach of warranty and contract.  Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Carthel L. Smith, Jr., Lexington, Tennessee, for the appellants, William H. Teague and William T. Teague d/b/a Teague Construction.

Lewis L. Cobb and Lowe Finney, Jackson, Tennessee, for the appellees, Scott Campbell and Sandie Campbell.

**OPINION**

In 2003, Scott Campbell and his wife, Sandie (together, the "Campbells," or "Appellees"), were in the market for a new home.  To that end, the Campbells met with builders William H. "Junior" Teague and his son, William T. "Terry" Teague (together, the "Teagues" or "Appellants"), who were in the process of constructing a residence at 169 Britney Lane in Lexington, Tennessee (the "Property").  Mrs. Campbell testified that, upon first meeting with the Teagues, she and her husband expressed their desire for a well-built home; Mrs. Campbell was specifically concerned with finding a home that would withstand tornadoes as well as possible.  According to Mrs. Campbell, the Teagues indicated that the Property was well built and that the basement was like a "bomb shelter."  The Teagues also indicated that their work had passed all inspections on the first pass.  The Teagues further indicated that the Property was constructed with premium lumber, and that it contained a

five-ton, high-quality HVAC unit.

Although the Campbells were impressed with the Teagues' representations, they expressed concern over the grading of the lot. In response, the Teagues allegedly promised that the grading issue would be remedied by the time construction was completed. Following this conversation, the Campbells made an offer of the full asking price, which offer the Teagues accepted. On July 2, 2003, the Campbells signed a purchase and sales agreement. Prior to closing on the Property, the Campbells attempted to perform a "final walk through" as promised in the sales contract; however, the inspection could not be done because too many things had not yet been completed. Despite this problem, the Teagues and their realtor, assured the Campbells that everything would be finished shortly after the closing. To assuage the Campbells' concerns, the Teagues offered an unlimited one-year warranty on the home. On July 31, 2003, the Campbells went ahead with the closing, purchasing the Property for $240,500.00.

The day after the closing, the Campbells allegedly noticed a large crack in the front porch floor. The Campbells notified the Teagues, who made no indication that the repair would be done. Mrs. Campbell testified that, in retrospect, she suspected that the problem with the porch existed at the time of the final walk through prior to purchase. She testified that, when she and her husband attempted to step out onto the porch, Mr. Junior Teague blocked her, stating that there was wet paint on the porch.

As the weeks passed, the Campbells discovered more problems with the Property. One of these problems was a strong stench (both inside and outside the house). Ultimately, the Campbells discovered that the smell inside the house emanated from stagnant water and mold in the crawl space. When the Campbells asked Mr. Junior Teague about the possible cause of the exterior smell, he allegedly explained that the odor was "methane gas," and attributed the odor to the alleged fact that the Teagues "did too good a job on the plumbing vent."

As the weeks progressed, more problems with the Property allegedly arose. According to the Campbells' testimonies, the floors began to buckle, the basement leaked when it rained, walls cracked, the HVAC unit was defective, the crown molding began to separate. The Campbells contacted Tim Ferguson, a professional building inspector, to look at the Property for possible building code violations. Following his inspection, Mr. Ferguson provided the Campbells with a rather long list of violations.

Eventually, more water gathered in the crawl space, mold formed on the floor joists, and the buckling of the floor worsened. According to the record, there was also approximately an eighteen degree temperature variation between rooms. The problem with

the HVAC system was ultimately diagnosed as inappropriate ductwork. Specifically, the Teagues had used ductwork designed for a three-and-one-half ton unit, but had installed a five ton unit.

The Campbells sent a certified letter to the Teagues, demanding that the problems be remedied. In response, the Teagues sent an inspector, Tony Blankenship, to look at the Property. After his inspection, Mr. Blankenship affirmed Mr. Ferguson's findings of numerous building code violations. Following Mr. Blankeship's inspection, the Teagues sent word through their first attorney, Steve Beal, that they would send a written offer to buy the house back. After hearing nothing for more than three weeks, the Campbells sent a second letter, requesting that the Teagues buy back the Property.

By mid-May 2004, mold had almost completely covered the entire flooring system, including the floor joists, subfloor, girders, piers, and shims. The air quality was so compromised that the EPA recommended that the windows be left open as much as possible, and that the HVAC system not be used at all.

On July 7, 2004, the Campbells filed suit against the Teagues, seeking damages pursuant to the Tennessee Consumer Protection Act, punitive damages, rescission of the contract, fees, costs, pre-judgment and post-judgment interest, and other relief to which they may have been entitled. By November 2004, the roof was sagging in at least three places; and yet the Teagues still had not done anything to remedy the problems or to buy back the Property. In December 2004, the Campbells sought the help of their attorney to request that the Teagues at least repair the HVAC system, so that the Campbells could have sufficient heat throughout the house. In response, the Teagues' second attorney, Brad Box, indicated to the Campbells' attorney that the Teagues would send someone over to repair the heat. However, no repairman came out. The Campbells made a second request for the Teagues to repair the heat; and, again, no repairman came.

On February 26, 2006, the parties partially settled the matter through mediation. Specifically, the Teagues agreed to buy back the property. As part of the settlement, the Campbells reserved the right to seek consequential damages against the Teagues, as well as attorney's fees under the Tennessee Consumer Protection Act. On May 19, 2007, the Chancellor heard arguments, concerning the issue of whether certain consequential damages were recoverable, and subsequently ruled that the Campbells could present proof of their damages at trial.

As the Campbells sought the advice of experts in preparation for trial, it allegedly became clear that the Property could not be repaired in a cost effective manner, and that the house needed to be demonlished. The reports of the Campbells' experts, Dr. Hal Deatherage

and Dr. Ruben Shmulsky indicate that: (1) substandard grade lumber was used in the construction of the home, (2) the structural components of the house had begun to decay, (3) the roofing and flooring systems needed to be replaced due to decay, and (4) the house was not cost-effective to repair.[1]

A bench trial was held on July 25, July 26, and November 30, 2006. At these hearings, the Campbells presented proof of the following damages:

| | |
|---|---|
| (1) Lost Wages | $ 5,000.00 |
| (2) Moving Expenses | $ 2,980.20 |
| (3) Construction Cost Increase | $45,695.00 |
| (4) Increase in Value of Lot | $11,500.00 |
| (5) Improvements | $ 5,000.00 |
| (6) Utilities | $ 8,858.78 |
| (7) HVAC Repair | $ 6,800.00 |
| (8) Closing Costs | $ 7,387.99 |
| (9) Mortgage Interest | $26,119.67 |
| (10) Taxes, Insurance, and PMI | $10,321.46 |
| (11) 2006 Mortgage Interest, Taxes, Insurance, and PMI | $ 3.857.22 |
| (12) Interest on Cash Payment | $ 5,946.70 |
| (13) Mortgage Cost Increase | $31,025.50 |
| (14) Closing Costs for Buy Back | $ 75.00 |
| **TOTAL** | **$171,117.52** |

Following the hearings, the trial court took the case under advisement. On November 15, 2007, the court issued its written findings by letter. In relevant part, the Court found that:

> [The Campbells] were particularly interested in a well-built home with a basement because of Mrs. Campbell's fear of tornadoes. Mrs. Campbell also had experience in the lumber industry and was particularly interested in having good lumber used in the construction.... The Court will not attempt to go through all of the problems that began to be complained of,

---

[1] Prior to trial, the Teagues filed a motion *in limine*, challenging Dr. Deatherage's qualifications to testify as an expert witness on the increased costs to the Campbells to reconstruct the same residence. On July 27, 2009, the court denied the motion *in limine*, and allowed Dr. Deatherage to testify. No issue has been raised concerning the motion *in limine*.

some of them included a large crack in the front porch, which was never repaired. The HVAC was not working properly...[t]his was not repaired and the [Campbells] did have to repair it themselves. There were other problems with mold, foul odors, and buckling of the floor.... [The Campbells] sought the advice of qualified experts who opined that substandard lumber was used in the construction, that there was decay beginning in the structural components, that the roofing and flooring systems would need replacing and the home was not cost effective to repair.

Based upon its conclusion that the Teagues "acted in an unfair and deceptive manner toward the [Campbells]," and that the Teagues had violated the Tennessee Consumer Protection Act, as codified at Tenn. Code Ann. §47-18-101 *et seq*., the court awarded the Campbells damages as follows:

| | |
|---|---|
| (1) Lost Wages | $ 5,250.00 |
| (2) Moving Expenses | $ 2,980.20 |
| (3) Construction Cost Increase | $45,695.00 |
| (4) Increase in Value of Lot | $14,450.00 |
| (5) Improvements | $ 5,000.00 |
| (6) Utilities | $ 4,400.00 |
| (7) HVAC Repair | $ 6,800.00 |
| (8) Closing Costs | $ 7,387.99 |
| (9) Mortgage Interest | $26,119.67 |
| (10) Taxes, Insurance, and PMI | $10,321.46 |
| (11) 2006 Mortgage Interest, Taxes, Insurance, and PMI | $ 3.857.22 |
| (12) Interest on Cash Payment | $ 5,946.70 |
| (13) Mortgage Cost Increase | $31,025.50 |
| (14) Closing Costs for Buy Back | $ 75.00 |
| **TOTAL** | **$169,308.08** |

In addition, the court concluded that the Teagues were entitled to the following set-offs against the $169,308.08 award:

| | |
|---|---|
| (1) Painting and Repairs | $2,950.00 |
| (2) Country River Pools Estimate | $1,000.00 |
| (3) Discount Carpet Estimate | $3,491.64 |

(4) Rental from 8/1/03 to 3/31/06 at
    $700.00 per month                              $22,400.00

**TOTAL:**                                         **$29,841.64**

In addition, the trial court found that the Campbells were entitled to pre-judgment interest in the amount of 7% per annum from the date of closing to the date of entry of the judgment, and that post-judgment interest would accrue at a rate of 10% per annum on the unpaid balance of the judgment until same was paid in full. Based upon the court's conclusion that the Teagues had acted in an unfair and deceptive manner, thereby violating the Tennessee Consumer Protection Act, the court awarded the Campbells attorney's fees and expenses, and assessed costs against the Teagues. By letter of December 12, 2007, the Court stated its findings, regarding pre-judgment interest, as follows:

1. Prejudgment interest at 7% per annum should be *recalculated* on items comprising the total judgment as follows:

(a) Lost wages                                     $5,250.00
Because the Court could not determine exactly what date the wages were lost, the Court determined that the last day of lost wages would be the last day of the trial. Therefore, the lost wages pre-judgment interest would be computed from November 30, 2006

(b) Moving Expenses                                $2,980.00
Compute prejudgment interest from May 31, 2006.

(c) Construction Cost Increase                     $45,695.00
Compute interest from May 31, 2006

(d) Increase in Value of Lot                       $14,450.00
Compute interest from May 31, 2006

(e) Improvements made by Plaintiffs                $ 5,000.00
Compute interest from May 31, 2006

(f) Utilities                                      $ 4,400.00
Compute interest from May 31, 2006

(g) HVAC Repairs                                   $ 6,800.00

Compute interest from May 31, 2006

(h) Closing Costs on Mortgage Loan     $ 7,387.99
Compute interest from July 31, 2003
(date of original purchase)

(i) Mortgage Interest from 8/1/03 to
3/31/06                             $26,119.67
Compute interest from April 1, 2006
(Date of retransfer of property)

(j) Taxes, Insurance, Private Mortgage
 Insurance through 2005          $10,321.00
Compute interest from January 1, 2006

(k) 2006 Taxes, Insurance, Private Mortgage
Insurance and Mortgage Interest     $ 3,857.22
Compute interest from May 31, 2006

(l) Interest on cash down payment     $ 5,946.70
Compute interest from November 30, 2006
because this figure represents interest to that date.

(m) Mortgage Cost Increase         $31,025.50
Interest denied because not yet accrued

(n) Closing Costs for Buy-Back       $    75.00
Compute interest from May 31, 2006

In addition, the trial court awarded the Campbells attorney's fees in the amount of $52,804.75, and discretionary costs in the amount of $11,297.82, with both amounts subject to post-judgment interest only. The trial court purported to enter a final judgment on January 22, 2009, and the Teagues filed a timely notice of appeal. Following review of the appellate record, this Court determined that the January 22, 2009 Order was not final because it did not adjudicate: (1) the Campbells' claim for treble damages under the Consumer Protection Act, (2) the Campbells' claims for punitive damages, (3) the Campbells' motion for sanctions filed on July 29, 2005, (4) the Teagues' motion *in limine*, and (5) the Campbells' motion for temporary restraining order filed on August 15, 2007. On January 21, 2010, this Court entered an order, instructing the Appellants to supplement the record with rulings on these matters. On February 3, 2010, Appellants filed a supplemental volume (Vol. 16) with the

Court, which supplemental volume contains an amended final decree, an order on the motion for sanctions, and order on alternative dispute resolution, an order on the motion *in limine*, and an order on the motion for temporary restraining order. The amended final judgment was filed in the trial court on January 28, 2010, *nunc pro tunc* to January 22, 2009, and awards the Campbells judgment as follows:

| | |
|---|---|
| Damages: | $169,308.08 |
| Prejudgment Interest: | $ 17,052.53 |
| Attorney's Fees: | $ 52,804.75 |
| Expenses and Costs: | $ 11,297.82 |
| **Subtotal** | **$250,463.18** |
| Offsets Allowed Defendants | ($ 29,841.64) |
| **TOTAL:** | **$220,621.54** |

Following review of this order, along with the other supplemental filings, it appears that the case is now in the proper posture for our review. On November 30, 2009, the Campbells filed a motion with this Court, requesting that the Court strike any and all testimony of Greg Bird, the building inspector for the City of Lexington, from the Teagues' brief. The Teagues did not oppose this motion; by Order of December 23, 2009, this Court granted the Campbells' motion.

The Teagues raise three issues for review, which we restate as follows:

> 1. Did the trial court err in finding that the Teagues had violated the Tennessee Consumer Protection Act.
>
> 2. Based upon the fact that the Teagues repurchased the property from the Campbells, to what damages are the Campbells entitled?
>
> 3. If the Campbells are entitled to damages in this case, then does the proof support the amount of the damages awarded?

In the posture of Appellee, the Campbells raise the issue of whether the trial court erred in allowing the Teagues an offset against the damages, and also ask this Court to award them attorney's fees and expenses accrued in defense of this appeal.

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App.1997). The weight, faith, and credit to be given to any witness' testimony lies, in the first instance, with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

## Tennessee Consumer Protection Act

On appeal, the Teagues contend that, due to the partial settlement entered into by the parties (wherein the Teagues agreed to buy back the property), this case no longer hinges upon the defective nature of the home. Based upon this fact, the Teagues argue that the Tennessee Consumer Protection Act, Tenn. Code Ann. §47-18-101 *et seq*. ("TCPA"), is not applicable and that, consequently, the trial court erred in applying the TCPA to award the Campbells their attorney's fees and expenses as provided by statute therein.

As noted by our Supreme Court in the recent case of *Fayne v. Vincent*, 301 S.W.3d 162 (Tenn. 2009), the TCPA "was passed, in part, to protect consumers from unfair and deceptive acts and practices occurring 'in the conduct of any trade or commerce' in the state and to provide a means 'for maintaining ethical standards of dealing between persons engaged in business and the consuming public.'" *Id*. at 172 (quoting Tenn. Code Ann.§ 47-18-102(2), -102(4)). The Act is to be liberally construed in order to enable it to protect the consumer and to promote the other policies that motivated its passage. Tenn. Code Ann. § 47-18-102; *Myint v. Allstate Ins. Co.*, 970 S.W.2d at 926; *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn.1992); *see also* Tenn. Code Ann. § 47-18-115 (noting that the Act is "remedial legislation," which should be construed to effectuate its purposes).[2] However, relying, in part, on the TCPA's purpose of "maintaining ethical standards of dealing between persons engaged in business and the consuming public," Tenn. Code Ann. § 47-18-102(4), courts have limited the Act's application to "transactions between businesses and consumers and not to casual, non-commercial transactions between two individuals." *White v. Eastland*, No. 01A01-9009-CV-00329, 1991 WL 149735, at *3 (Tenn. Ct. App.

---

[2] The TCPA is also to be construed consistently with the Federal Trade Commission and federal courts' interpretations of the Federal Trade Commission Act. Tenn. Code Ann. § 47-18-115. *Fayne v. Vincent*, 301 S.W.3d at 173.

Aug.9, 1991) (No Tenn. R. App. P. 11 application filed).

In order to accomplish its goal, the TCPA forbids "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(b). The Act defines "trade," "commerce," or "consumer transaction" as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn. Code Ann. § 47-18-103(11). The Act covers the transfer of real property and applies to the Campbells, who fall under the definition of "consumer" as set out in the Act.[3] *See Ganzevoort v. Russell*, 949 S.W.2d 293, 297 (Tenn. 1997). In addition to the general prohibition against unfair and deceptive acts or practices affecting the conduct of any trade or commerce, the TCPA also sets out specific acts and practices that are unlawful under the Act. As it relates to the case at bar, the applicable portion of the TCPA is found at Tenn. Code Ann. §47-18-104(b)(7), which provides that it is unlawful to represent "that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Moreover, Tenn. Code Ann. §47-18-104(b)(27) is a "catch-all" provision, prohibiting "any other act or practice which is deceptive to the consumer or any other person."

In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated...." Tenn. Code Ann. § 47-18-109(a)(1). As discussed below, the defendant's conduct need not be willful or even knowing; however, if it is, the TCPA permits the trial court to award treble damages. Tenn. Code Ann. § 47-18-109(a)(3); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 910 n. 13 (Tenn.1999); *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 306 (Tenn. Ct. App.1984).

The TCPA does not impose a single, bright-line standard for determining whether a particular act or practice is deceptive for the purpose of Tenn. Code Ann. § 47-18-104(b)(27); *Fayne v. Vincent*, 301 S.W.3d at 177 (relying on *Ganzevoort v. Russell*, 949 S.W.2d at 300. As a result, the standards to be used in determining whether a representation is "unfair" or "deceptive" under the TCPA are legal matters to be decided by the courts. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (internal

---

[3] Tenn. Code Ann. § 47-18-103(2) defines "consumer" as "any natural person who seeks or acquires by purchase, rent, lease, assignment, award by chance, or other disposition, any goods, services, or property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated."

citations omitted).  However, whether a specific representation in a particular case is "unfair" or "deceptive" is a question of fact. *Id*.  Although there is no single standard for all cases, we do know that, in order to be considered deceptive, an act is not necessarily required to be knowing or intentional, and negligent misrepresentations may be found to be violations of the Act.  *Fayne*, 301 S.W.3d at 177  (relying on *Holladay v. Speed*, 208 S.W.3d 408, 416 (Tenn. Ct. App.2005; *Tucker v. Sierra Builders*, 180 S.W.3d at 115; *Smith v. Scott Lewis Chevrolet, Inc*., 843 S.W.2d 9, 13 (Tenn. Ct. App.1992); Jeff  Mueller, New Home Construction Liability, Tenn. B.J., May 2007, at 18, 20)). A deceptive act or practice is, in essence, "a material representation, practice or omission likely to mislead ... reasonable consumer[s]" to their detriment. *Ganzevoort v. Russell*, 949 S.W.2d at 299 (quoting *Bisson v. Ward*, 160 Vt. 343, 628 A.2d 1256, 1261 (1993)).  In *Tucker v. Sierra Builders*, this Court explained:

> A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact.FN10 Thus, for the purposes of the TCPA and other little FTC acts, the essence of deception is misleading consumers by a merchant's statements, silence, or actions. Jonathan Sheldon & Carolyn L. Carter, Unfair and Deceptive Acts and Practices § 4.2.3.1, at 118-19 (5th ed.2001) [hereinafter Unfair and Deceptive Acts and Practices].
>
> The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive. Unfair and Deceptive Acts and Practices § 4.3.3.1, at 156. In the 1994 legislation reauthorizing the Federal Trade Commission, Congress undertook to codify the Commission's policy statement on unfairness by stating that an act or practice should not be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n). Following the mandate of Tenn. Code Ann. § 47-18-115, we will use this description of unfairness to guide our interpretation of Tenn. Code Ann. § 47-18-104(a).

*Tucker v. Sierra Builders*, 180 S.W.3d 116-117 (footnotes omitted).

Turning to the record in the instant case, we find several facts upon which the trial court could base a determination that the Teagues violated the TCPA.

<u>Licensing</u>

It is undisputed that the Teagues held themselves out as qualified builders. However, there is some question in the trial record as to whether the Teagues were properly licensed in this case. When licensed by the Tennessee State Board of Licensing Contractors, a contractor is assigned certain monetary limitations, over which he or she is not authorized to act as a licensed contractor. Tenn. Code Ann. §62-6-111(a)(3). For example, if a contractor's monetary limit is $250,000, that contractor may not enter into contracts for work in excess of that amount. Tenn Code Ann. § 62-6-136 provides, in pertinent part:

> (a) It is unlawful for any person, firm or corporation to represent itself as a licensed contractor or to act in the capacity of a "contractor" as defined in §§ 62-6-102, or 62-37-103, and related rules and regulations of this state, or any similar statutes, rules and regulations of another state, while not licensed, unless such person, firm or corporation has been duly licensed under § 62-6-103 or § 62-37-104.

> (b) In addition to the penalties set out in § 62-6-120, § 62-37-114 or § 62-37-127, a violation of this section shall be construed to constitute an unfair or deceptive act or practice affecting the conduct of trade or commerce under the Tennessee Consumer Protection Act of 1977, compiled in title 47, chapter 18, part 1; and, as such, the private right of action remedy under the Tennessee Consumer Protection Act of 1977 shall be available to any person who suffers an ascertainable loss of money or property, real, personal or mixed, or any other article, commodity or thing of value wherever situated as a result of the violation.

Tenn Code Ann. § 62-6-136(a)-(b). In short, a contractor who holds himself or herself out as a properly licensed contractor, and who is not, in fact, properly licensed commits a *per se* violation of the TCPA.

The undisputed proof in this case is that the Teagues' license had a monetary limit of $200,000; however, they contracted to build a $240,500.00 house (even if we exclude the value of the pool, the house was still valued over $200,000). Relying upon the 2002 version

of Tenn. Code Ann. §62-6-102(D), which was in effect at the time of the construction of the home at issue in this case, the Teagues argue that they are excepted from the monetary limitation. Tenn Code. Ann. §62-6-102(D)(2002), provides that:

> (D) "Contractor" does not include:
>
>> (I) Undertaking in one's county of residence solely to construct residences or dwellings on private property for the purpose of resale if such county has a population [less than 56,000].

On appeal, the Campbells assert that, at the time the Campbells' house was built, Henderson County was not within the specific population range contemplated in Tenn. Code Ann. §62-6-102(D)(2002).[4] Consequently, they assert that the Teagues' exemption argument is without merit. Neither party has cited this Court to the place in the record where the Henderson County population may be found, nor is it incumbent upon this Court to sift through the record in order to find proof to substantiate the positions of the parties. *See Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 557 (Tenn. Ct. App.1985). Consequently, we cannot find, as a matter of fact or law, that Henderson County was an exempt county under Tenn Code. Ann. §62-6-102(D)(2002). That being said, there is sufficient proof, beyond the licensing issue, from which the trial court could have concluded that the Teagues' practices were in violation of the TCPA.

<u>Lumber</u>

The proof submitted at trial indicates that some of the lumber used in the construction of the subject home was unstamped, ungraded, and/or undersized. In his evidentiary deposition, Dr. Hal Deatherage, a professor of civil and environmental engineering at the University of Tennessee and the owner of Construction Engineering Consultants, stated that his inspection of the property revealed numerous construction defects, including the use of ungraded lumber.

As indicated by the proof, the Southern Building Code requires use of grade 2 or higher wood in the construction of homes because there are no strength requirements associated with ungraded lumber. Consequently, use of ungraded lumber causes a house to be structurally unsound and a safety hazard. In addition to finding ungraded wood in the

---

[4] The Tennessee Attorney General rendered an opinion, holding that the population limits imposed by Tenn. Code Ann. §62-6-102(D)(2002) are unconstitutional. 99 Tenn. AG 112, 1999 WL 321919 (Tenn.A.G.). This statute has since been amended to remove the population limits.

home, Dr. Deatheridge further testified that inappropriate spans were used in the construction process, i.e., the lumber pieces were cut too long for the size of the lumber that was used.

Dr. Ruben Shmulsky, an expert in wood, wood-based products, and light-frame construction, testified at trial that, upon inspection of the home, he also found many ungraded pieces of wood, which he opined was a significant variance from the applicable building standards. While the Teagues claimed that all lumber used in the construction of the subject house was purchased from 84 Lumber Company, the receipts and invoices produced did not add up to the full amount of lumber needed to construct the home. At the trial, the Teagues eventually produced a receipt from 84 Lumber, which receipt purported to be for the missing lumber. The problem with this invoice is that it was dated over one year before the Teagues began construction on the Campbells' house. Moreover, the claim that this receipt was for lumber used for construction of the subject house is contradicted by the Teagues' own testimony that all construction materials were purchased with proceeds from their construction loan, which loan was not obtained until June 2002, more than a year after the date of the proffered invoice. When this discrepancy was brought to his attention, Mr. Junior Teague testified that he had bought the lumber for the Campbells' project fourteen months prior to construction because the lumber was cheaper at that time. However, this claim was shown to be false, as the lumber listed on the disputed 2002 invoice was significantly higher priced than the same type of lumber that was purchased fourteen months later. The Teagues ultimately admitted that they were building other houses during 2002, and that the disputed lumber could actually have been used in those projects. The Teagues relied upon the testimony of Charlie Conrad, a representative of 84 Lumber, to support their claim that all of the lumber used in the construction of the subject home was purchased from 84 Lumber and was of good quality. However, Mr. Conrad admitted that he did not know if the Teagues purchased lumber from other sources, that the Teagues were building other houses in the same subdivision at the same time they were constructing the Campbells' house, and that it would not make sense for someone to buy lumber fourteen months prior to beginning the project. Moreover, while Mr. Conrad first testified that the lumber at issue was delivered to the job site, he later changed his testimony to indicate that the lumber was, in fact, delivered to Junior Teagues' house. This change in testimony corresponds with Terry Teagues' testimony that lumber used in the Campbells' home was stored behind his father's house prior to use in the project. This fact, perhaps, explains the most egregious facts surrounding the lumber used in the construction of the Campbells' house.

Dr. Shmulsky testified, and photos supporting his testimony were admitted into evidence, that one of the issues he found was I-beams under the house that were splitting from "weathering associated with months-long storage outside," sub-flooring that was delaminated (i.e., separated), and multiple colonies of spores and mold on wood throughout the house. Dr. Shmulsky testified that delamination of the sub-floor would be caused by the

-14-

wood being exposed to moisture, and opined that "most of the moisture problems, weathering, and delamination occurred prior to or during construction." The photos support this conclusion, as they show bad wood scattered throughout the house, as opposed to concentrated in one area (which would indicate damage caused by a water leak). From all of the evidence in the record, it appears that the Teagues either purchased sub-standard lumber, or stored good lumber outside so that it deteriorated to the point of being unsuitable for use in home construction. Regardless, the fact remains that much of the lumber used in the home was defective and, in fact, was already growing dangerous mold at the time it was installed.

General Construction of the Home

Due in large part to the use of unfit, or water damaged, wood, Dr. Shmulsky opined that there were five major problems with the overall construction of the home. These problems included: (1) moisture infiltration, (2) mildew and decay, (3) bad construction of the main floor of the house, (4) bad construction in the attic/roof of the house, and (5) mineral streaking on the finished main floor of the house.

It is undisputed that there was water leaking into the basement area, and this fact is evinced by photos showing water marks on the walls of the basement. In addition, and this too is undisputed, the grading on the property was such that water did not drain properly, and accumulated in the crawl space under the house. Dr. Shmulsky testified that his inspection revealed that the crawl space was muddy, and that there were waterlines on the cement blocks, suggesting times of standing water in the crawl space. According to Dr. Schmulsky, this standing water feeds the mold spores that are already present in the wood, causing mold infestation and spreading to all parts of the flooring system. Dr. Shmulsky further opined that this excess moisture was also responsible for the mineral streaking in the main floor of the house. To further compromise the flooring system, damaged I-beams were used, and Dr. Shmulsky found that some I-beams were splitting and that one was, in fact, crushed. Moreover, some of the I-beams were not resting on the piers so as to properly support the structure.

In the attic, Dr. Shmulsky found approximately ten rafter ceiling joists that were molding and decaying, which would account for the alleged sagging of the roof. He also found the unstamped and wrong sized lumber that is discussed above.

Dr. Shmulsky's testimony is corroborated by that of Tim Ferguson, a home inspector. According to Mr. Ferguson's report, the Campbells' home had some twenty-six building code violations and eighteen workmanship violations. The Teagues' own inspector, Tony Blankenship, could not refute these findings.

Dr. Deatheridge also opined that the construction of the home was inferior and defective. Specifically, he testified that: (1) ungraded lumber was used in the construction, (2) floor trusses had been compromised, (3) piers had been compromised (the Teagues admit that many of the cinder blocks used in the construction were seconds), (4) there were inadequate foundations for the piers, (5) there was a water infiltration problem, (6)there was deterioration of framing lumber, (7) there was evidence of rot and mold, (8) the roof sagged due to spans that were too long, and (9) there was excessive cracking in the concrete. Dr. Deatheridge opined that the repair costs would total approximately $217,643.00.

Perhaps most egregious is the fact that, despite giving the Campbells a one-year express warranty when they purchased the home, the Teagues repeatedly refused to honor that agreement, even though they knew of the safety concerns and code violations. For example, the Teagues refused to fix a large crack in the front porch concrete and, in fact, there is some evidence that the Teagues blocked the Campbells' final walk-through inspection of the porch. In addition, the Teagues ignored the Campbells' complaints (and Mr. Ferguson's report) that the flooring system needed repairs, and that there were numerous code violations. The Teagues refused to repair the HVAC system, forcing the Campbells to endure winter temperatures without proper heat. Even though made in writing, and made several times, these requests were systematically ignored by the Teagues.

From all of the above, we conclude that there is ample evidence to support the trial court's finding that the Teagues acted in violation of Tenn. Code Ann. §47-18-104(b)(7), by representing that the goods and services were of a particular standard, while they were not, and in violation of Tenn. Code Ann. §47-18-104(b)(27) by engaging in deceptive acts and practices. Consequently, the trial court did not err in awarding the Campbells' attorney's fees as provided under the Act. The Teagues have raised no issue concerning the amount of fees awarded; however, after reviewing the record, we conclude the preponderance of the evidence supports the trial court's award of $52,804.75 in attorney's fees and $11,297.82 in expenses.

## **Other Damages**

### Waiver of Warranties

As noted above, the Teagues provided the Campbells with a "Builder's One Year Warranty," which was admitted into evidence as Trial Exhibit 6. This warranty provides:

> I, William Teague hereby agree[s] to provide a **One** (1) year
> warranty, excluding manufacturers warranties, and "Act[s] of
> God" on the property located at 168 Britney Lane. This is a

workmanship warranty and excludes routine maintenance and normal wear and tear.

This warranty is signed by Mrs. Campbell and by both Junior Teague and Terry Teague.

Paragraph 8 of the Purchase Agreement was subsequently replaced with an amendment titled "Amendment to Inspection Contingency," which was admitted into evidence as part of Trial Exhibit 4. This amendment, which is only signed by Mr. Campbell, provides for a waiver of a home inspection except for the final inspection to insure that the Property was in the same condition as it was in on the date of the Purchase Agreement, and to determine that all repairs/replacements had been completed. This provision provides:

> **CONDITION OF PROPERTY**. The improvements of said property are to be delivered in as good a condition on the date of closing as they were on the date of [the] Purchase and Sale Agreement, ordinary wear and tear excepted. All heat/air/plumbing/electrical equipment, appliances and septic tank to be in good working condition at [the] time of closing and all warranties and representations contained herein shall become null and void after closing of said property.

Relying upon this provision, the Teagues argue that the Campbells waived any warranties, express or implied, and that the Campbells are, consequently, barred from recovery. We disagree.

In *Dixon v. Mountain City Construction Co.*, 632 S.W.2d 538 (Tenn.1982), our Supreme Court adopted the doctrine of the implied warranty of good workmanship and materials as applied to newly built dwellings, stating:

> [W]e hold that in every contract for the sale of a recently completed dwelling, and in every contract for the sale of a dwelling then under construction, the vendor, if he be in the business of building such dwellings, shall be held to impliedly warrant to the initial vendee that, at the time of the passing of the deed or the taking of possession by the initial vendee (whichever first occurs), the dwelling, together with all its fixtures, is sufficiently free from major structural defects, and is constructed in a workmanlike manner, so as to meet the standard of workmanlike quality then prevailing at the time and place of construction; and that this implied warranty in the contract of

-17-

sale survives the passing of the deed or the taking of possession by the initial vendee.

*Id*. at 543.

The ***Dixon*** Court also noted that:

> This warranty is implied only when the written contract is silent. Builder-vendors and purchasers are free to contract in writing for a warranty upon different terms and conditions or to expressly disclaim any warranty.

*Id.* at 542.

Subsequently, this Court, in ***Dewberry v. Maddox***, 755 S.W.2d 50, 55 (Tenn. Ct. App. 1988), stated:

> [W]e think that in order to have a valid disclaimer of the implied warranty, it must be in clear and unambiguous language. The buyer must be given "adequate notice of the implied warranty protections that he is waiving by signing the contract."

*Id*. at 55 (quoting ***Tyus v. Resta***, 328 Pa. Super. 11, 476 A.2d 427, 432 (1984)); *see also* ***Axline v. Kutner***, 863 S.W.2d 421, 424 (Tenn. Ct. App.1993). In so holding, the ***Dewberry*** Court noted that "[i]t would completely defeat the precedent set by Dixon if a seller could circumvent the implied warranty by expressly warranting some aspect of a new house which has nothing to do with the workmanship or the materials used." ***Dewberry***, 755 S.W.2d at 54. The ***Dewberry*** Court ultimately held that the attempted disclaimer at issue in that case was not "adequate to disclaim the implied warranty," because such waiver "must be in clear and unambiguous language." ***Id.***[5] Specifically, the Court reasoned that:

---

[5] The purported waiver at issue in ***Dewberry*** provides, in pertinent part:

> Seller agrees to have plumbing, heating, electrical, appliances, and air conditioning systems in good working order at the time of closing.... Purchaser accepts Property in its existing condition, no warranties or representations having been made by Seller or Agent which are not expressly stated herein.

(continued...)

-18-

> Because the buyer is completely relying on the skills of the vendor-builder in this situation, we think that in order to have a valid disclaimer of the implied warranty, it must be in clear and unambiguous language. The buyer must be given "adequate notice of the implied warranty protections that he is waiving by signing the contract." *Tyus v. Resta*, 328 Pa. Super. 11, 476 A.2d 427, 432 (1984). In addition, such a "disclaimer" must be strictly construed against the seller. *Id*.

*Dewberry*, 755 S.W.2d at 55.

In the subsequent case of *Axline v. Kutner*, 863 S.W.2d 421 (Tenn. Ct. App. 1993), this Court again found that a disclaimer almost identical to the one at issue in *Dewberry*, *see* fn. 5, was inadequate to disclaim the implied warranty. In addition, the *Axline* Court held that the inclusion of a provision in the sales contract, providing for a "1 year builders warranty" was "meaningless," and was not sufficient to avoid the implied warranty of good workmanship and materials "because there is no indication [as to] what the builder is warranting." *Axline*, 863 S.W.2d at 424.

Based upon the foregoing authority, it is clear that no waiver of the implied warranty of good workmanship and material is present in this case. Specifically, there is no express provision notifying the Campbells that they are waiving the implied warranties. Moreover, the inclusion of a one year builder's warranty is not sufficient, under the *Axline* case, to waive the warranties implied in law.

Types of Damages Allowed

The Teagues primary argument concerning the award of damages in this case is that, because of the buy-back of the property, the Campbells should not receive additional damages in this case. However, the trial court specifically ruled that consequential damages were allowed above and beyond the buy-back price. We find that this ruling was not in error.

In *Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d 237, 241 (Tenn. Ct. App.1970), this Court explained the relationship between the two measures of damages for defects or omissions in the performance of construction contracts, to wit:

> As a general rule, the measure of damages is the cost of

---

[5](...continued)
*Dewberry*, 755 S.W.2d at 54.

correcting the defects or completing the omissions, rather than the difference in value between what ought to have been done in the performance of the contract and what has been done, where the correction or completion would not involve unreasonable destruction of the work done by the contractor and the cost thereof would not be grossly disproportionate to the results to be obtained. On the other hand, the courts generally adhere to the view that if a builder or contractor has not fully performed the terms of the construction agreement, but to repair the defects or omissions would require a substantial tearing down and rebuilding of the structure, the measure of damages is the difference in value between the work if it had been performed in accordance with the contract and that which was actually done, or (as it sometimes said) the difference between the value of the defective structure and that of the structure if properly completed. 13 Am.Jr.2nd, pp. 79, 80, 81 Section 79.

*Edenfield v. Woodlawn Manor, Inc.*, 462 S.W.2d at 241. In short, as a general rule, the measure of damages for defects and omissions in the performance of a construction contract is the reasonable cost of the required repairs. *See, e.g., Estate of Jesse v. White*, 633 S.W.2d 767 (Tenn. Ct. App. 1982). This is especially true when the structure involved is the owner's home. *Edenfield*, 462 S.W.2d at 237.

In addition to damages associated with diminution in value and cost of repairs, courts may also award all damages that are the normal and foreseeable result of a breach of contract. *Holladay v. Speed*, 208 S.W.3d 408, 415 (Tenn. Ct. App. 2005) (citing *Morrow v. Jones*, 166 S.W.3d 254 (Tenn. Ct. App. 2004)). These types of damages include reasonably foreseeable consequential and incidental damages. *Id.* In the present case, the parties stipulated that the Campbells did not need to prove a breach of contract in order to recover consequential damages. Consequently, the only issue the trial court had to determine was the amount of the consequential damages to which the Campbells are entitled.

In *Isaacs v. Bokor*, 566 S.W.2d 532, 536 (Tenn. 1978), a case involving rescission and restitution, our Supreme Court approved a jury's award of purchase payments, interest payments, and other incidental expenses to the purchaser of a residence. Relying upon its previous holding in *Isaacs*, our Supreme Court, in *Mills v. Brown*, 568 S.W.2d 100, 103 (Tenn. 1978), held that "a purchaser who has been the victim of fraud or mistake may recover, in addition to the purchase price, other damages which he may have incurred in good faith by reason of mistake, such as cost of improvements and the like."

In fact, the range of potentially recoverable consequential and incidental damages is very broad and varies from case to case. We now turn to discuss the specific damages awarded in this case to determine whether they are allowable under the law of our State and, if so, whether the proof in the record supports the amount(s) awarded by the trial court.

<u>Specific Consequential Damages Awarded to the Campbells</u>

1. <u>Lost Wages</u>

In the case of ***Gray v. Johnson Mobile Homes of Tennessee, Inc.***, No. W2001-01982-COA-R3-CV, 2003 WL 1618084 (Tenn. Ct. App. March 26, 2003), a purchaser of a defective mobile home presented proof of lost wages, and sought recovery of the lost wages and mortgage payments from the manufacturer and seller of the mobile home. ***Id***. In affirming the trial court's award of damages to the purchaser, this Court concluded, without discussion, that the award of lost wages as a consequential damage was proper. ***Id***. at *4.

In the case at bar, the Campbells presented uncontested proof that Mr. Campbell suffered lost wages as a direct consequence of the Teagues' breach of contract, breach of warranty, and violation of the TCPA. Specifically, Mr. Teague testified that, as a result of having to have the home inspected, and having to have repairs made to the home, he missed in excess of seventeen days of work. The undisputed testimony was that Mr. Campbell made $37.50 per hour, or $300 per eight-hour day. We conclude that the preponderance of the evidence supports the trial court's award of $5,500.00 in lost wages.

2. <u>Interest on Cash Portion of Purchase Price, Mortgage Payments, Insurance, Taxes and Moving Expenses</u>

In ***Turner v. Benson***, 672 S.W.2d 752 (Tenn. 1984), a breach of contract case involving a buyer's failure to close on the purchase of a residence, our Supreme Court held that "every item of expense incurred by plaintiffs as a direct result of owning two homes was within the contemplation of the parties at the time the contract was executed and is recoverable." ***Id***. at 756. In the ***Turner*** case, these damages included interest paid by the non-breaching party on money borrowed as a result of the defaulting buyer's breach, and also included interest on the cash that should have been paid by the breaching party at the scheduled closing. ***Id***. In addition, this Court approved the trial court's consequential damages award for moving expenses, repair costs necessary to maintain the residence, insurance costs, and utilities. ***Id***. at 756-57. Concerning the award of utilities, the ***Turner*** Court held that these expenses were incurred in an effort to mitigate damages, and opined that, "[h]ad the plaintiffs failed to insure the property and a loss resulted as a result thereof, they could easily have been chargeable with failure to carry such insurance. The same is true

-21-

with respect to the cost of heating the premises." *Id*. at 757 (internal citations omitted).

In *Gray v. Johnson Mobile Homes of Tennessee, Inc.*, this Court affirmed the award of mortgage payments to the purchaser of the defective mobile home. *Gray*, 2003 WL 1618084, at *4. Similarly, in *Isaacs*, our Supreme Court held that interest should be awarded to a rescinding purchaser for the time period that the rescinding purchaser failed to have the benefit of the purchase price. *Isaacs*, 566 S.W.2d at 529; *see also Masson v. Swan*, 53 Tenn. 450 (1871) (where the court allowed recovery of taxes paid during the period of occupancy).

Our courts have held that, when rescission is granted, a purchaser is entitled to the purchase money and any considerations paid for the property. *Estate of Minton v. Markham*, 625 S.W.2d 260, 262 (Tenn.1981). Relying upon *Estate of Minton*, this Court, in *Harrison v. Laursen*, No. 01-A-01-9204-CV-001771992, 1992 WL 301309 (Tenn. Ct. App. Oct. 23, 1992), allowed recovery of the purchase price, plus taxes paid on the property. *Harrison*, 1992 WL 301309, at *4. The court also noted that interest on the purchase money could be an appropriate award as well. *Id*. at *3 (citing *Mason v. Lawing*, 78 Tenn. (10 Lea) 264, 267 (Tenn. 1882)).

Turning to the record in this case, the Campbells purchased the Property from the Teagues for the purchase price of $240,500.00. The purchase price was paid from proceeds from a Bank of America loan in the amount of $216,450.00, with a 5.25% interest rate, and with cash in the amount of $22,993.08. The trial court awarded the Campbells $5,946.70 in interest on the cash payment of $22,993.08 (or 10% per annum). Following our review, we conclude that this amount is supported by a preponderance of the evidence. In addition, the court awarded the Campbells all of the interest paid on the mortgage, from the closing date to the date of the buy-back, in the total amount of $40,298.35 (which amount includes mortgage interest, taxes, insurance, and mortgage insurance). The court also awarded the Campbells their initial closing costs of $7,387.99, as well as the $75.00 closing costs for the buy-back. Based upon the foregoing, we conclude that these specific awards were proper consequential damages in this case, and that the preponderance of the evidence supports the amount of the awards. Concerning the moving expenses of $2,980.20 that were awarded to the Campbells, at the May 19, 2006 hearing, the Teagues conceded that this award was proper.

### 3. Improvements

In *Isaacs v. Bokor*, 566 S.W.2d 532 (Tenn. 1978), our Supreme Court noted that "[i]t does not necessarily follow... that because refund of the purchase price is a common measure of damages upon rescission, it is the only amount which can ever be recovered by the complaining party." *Id*. at 538. The *Isaacs* Court went on to hold that a rescinding purchaser

may recover the value of permanent improvements placed upon the property. *Id*. at 538-40.

At trial, the Campbells provided proof of the following improvements:

| Improvement | Cost |
| --- | --- |
| Waterfall at end of pool | $4,607.73 |
| Cabinet work | $  100.00 |
| Lighting | $  109.12 |
| Upgrade carpet pad | $  450.77 |
| DSL installation | $  325.22 |
| Gas line for dryer | $   50.00 |
| Satellite installation | $   218.23 |
| TOTAL | $5,861.07 |

During her testimony, Mrs. Campbell opined that these improvements increased the value of the property by $5,000.00, which is the amount awarded by the trial court. From our review of the record, neither the improvements, nor the amounts provided by the Campbells is disputed. Consequently, the evidence does not preponderate against the trial court's award of $5,000 for general improvements.

In addition to the improvements noted above, the evidence indicates that the Campbells paid McCoy's Heating and Air $6,800.00 to repair the defective HVAC system. It is undisputed in the record that, despite numerous requests from the Campbells and their attorney, the Teagues continually refused to remedy the problems with the HVAC. Therefore, the Campbells were forced to undertake the repairs themselves. Specifically, the HVAC repairs included the replacement of the improperly sized ductwork. The undisputed proof is that, because of the improper installation of the HVAC, there was an eighteen degree difference in temperature between rooms. Moreover, there is evidence to suggest that the original ductwork was contaminated with mold from the problems with the wood used in the construction. The HVAC was, in fact, the subject of a conference call with the trial court in 2005. At that time, the trial court agreed that the Campbells could make the expenditures that were necessary to repair the HVAC, and that these expenditures would be considered in the final ruling. From all of the proof, we conclude that the Campbells were entitled to recover their expenditure of $6,800.00 for necessary repairs to the HVAC system.

4. Increase in Cost of Construction, Increase in Mortgage Costs, and Increase in Lot Value

Concerning increases in construction costs, Dr. Deatherage testified that the increase

in the cost of construction, from the time the Campbells purchased the house in August 2003 until the time the Teagues bought the house back on March 21, 2006, would be approximately 18.5%, or $44,500.00.[6]  Another expert, Johnny Freeman, a licensed contractor, testified at trial that construction costs had risen almost 19% from 2003 to 2006. Specifically, in 2003, he stated that the cost for a new build was $53 per square foot; in 2006, the cost per square foot had risen to approximately $63.  Mr. Freeman opined that the difference in building costs from 2003 to 2006 would be approximately $45,695.00.  Even the Teagues' own expert, Jason Ussery, opined that the fair market price for a comparable house in today's market would be approximately $90 per square foot, which amount corroborates the testimonies of Dr. Deatherage and Mr. Freeman. From this testimony, we conclude that the evidence does not preponderate against the trial court's award of $45,695.00 in increased building costs.

Concerning the increased mortgage costs from 2003 to 2006, Stacy Flynn, a mortgage expert, testified by affidavit that the best mortgage rate possible, at the time of the trial, would be 6.375%, which is 1.125 percentage points higher than the Campbells' prior rate of 5.25%. Ms. Flynn went on to explain that, although the Campbells could buy the present rate down to 5.75% (at a cost of $6,493.50), there would still be a .5% difference from their prior rate.  So, over the life of a thirty year mortgage, this increased rate would translate to additional payments in the amount of $24,532.00.  From the record as a whole, we conclude that the evidence does not preponderate against the trial court's award of $31,025.50 in increased mortgage costs.

Turning to the land value, the trial court awarded $14,450.00 in increased costs.  At the time construction began in 2003, the evidence indicates that lots in the subject neighborhood were selling for approximately $13,500.00.  By the time the Teagues bought the property back, lots in the neighborhood were selling for at least $25,000.00.  During their respective testimonies, both Mr. Junior Teague and Mr. Terry Teague stated that the lots had increased in value at least $11,500.00.

Although the amount of damages arising from increased mortgage costs, building costs, and land costs are not exactly known, it is well settled that courts will allow recovery even if it is not possible to prove the exact amount of damages from a breach of contract. *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983). Uncertain and speculative damages are prohibited only when the existence of damages is uncertain, not when the amount is uncertain. *Id*. When there is substantial evidence in the record relative to damages and reasonable inferences may be drawn therefrom, mathematical certainty is not required

---

[6] Dr. Deatherage's opinion was based, in part, on the construction cost index promulgated by the United States Census Department.

to support an award of damages. *Id*. Consequently, we conclude that the trial court did not err in allowing recovery for increased mortgage costs, building costs, and land costs. Moreover, from the record as a whole, the evidence does not preponderate against the amount of these awards.

### 5. Pre-Judgment Interest

On appeal, the Teagues challenge the trial court's award of pre-judgment interest, as set out above. Tenn. Code Ann. §47-14-123 allows the trial court to award pre-judgment interest as an element of damages "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." It is well settled that an award of pre-judgment interest is within the sound discretion of the trial court, and the decision will not be disturbed by this Court absent an abuse of discretion. *Myint v. Allstate*, 970 S.W.2d 920, 927 (Tenn. 1998). The purpose of pre-judgment interest is to fully compensate a party for the loss of the use of funds, to which he or she is legally entitled. *Id.* Tennessee courts have shifted the balance to favor awarding pre-judgment interest whenever doing so will more fully compensate plaintiffs for the loss of use of their funds. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000) (citing *Myint*, 970 S.W.2d at 927).

In *Myint*, our Supreme Court set out certain principles that are to guide us in the decision of whether to award pre-judgment interest, to wit:

> Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.
>
> In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds.... The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds.

***Myint***, 970 S.W.2d at 927 (internal citations omitted).  However, uncertainty as to either the existence or as to the amount of damages does not mandate a denial of pre-judgment interest. ***Id***. at 928.  Moreover, the test of whether the amount of damages is certain is not whether the parties agree on a fixed amount, but rather whether the amount of damages is ascertainable by computation or by any recognized standard of valuation, even if there is a dispute over the monetary value or if the parties' experts have differing estimates.  ***Id***.

Applying the above principles to the case at bar, we find that the Campbells' damages are, for the most part, ascertainable, and also largely undisputed in the record.  Moreover, the Campbells did not unreasonably delay the filing of this suit, but rather moved quickly to protect their interests when it became clear that the Teagues would not make good on their promises to make necessary repairs.  In addition, there is no indication that the Campbells engaged in activities meant to delay the proceedings once the suit was filed.  Despite the protracted procedural history of this case, there is no indication that any delays were intentionally caused by the Campbells.  From the totality of the circumstances, we cannot conclude that the trial court abused its discretion in awarding pre-judgment interest to the Campbells in this case.

## 6.  Offsets

As set out above, the trial court allowed the Teagues $29,841.64 in offsets against the judgment.  While we concede that the specific amounts constituting the $29,841.64 are somewhat disputed, from the record as a whole, we cannot conclude that the evidence preponderates against this offset. Consequently, we cannot conclude that the trial court erred in this decision.

## Attorney's Fees

The Campbells have asked this Court to award them attorney's fees and costs accrued in defense of this appeal pursuant to the TCPA.  As held by our Supreme Court, "a plaintiff may be awarded reasonable attorney's fees incurred during an appeal on a claim brought under the TCPA where one or more of the TCPA's provisions has been violated." ***Killingsworth v. Ted Russell Ford, Inc.***, 205 S.W.3d 406, 410(Tenn. 2006). As reasoned by our Supreme Court:

> If an appeal ensues, the wronged plaintiff's monetary judgment is at risk of being consumed by the resulting appellate attorney's fees unless they are also subject to being awarded. A plaintiff successful at trial is therefore at risk of being "de-remedied" if unable to collect his or her reasonable appellate legal fees.

-26-

> Given the broad remedial goals our legislature determined to pursue with the TCPA, we do not think the General Assembly intended that result. As this Court has previously recognized, a potential award of attorney's fees under the TCPA is intended to make the prosecution of such claims economically viable to a plaintiff. ***Miller v. United Automax,*** 166 S.W.3d 692, 697 (Tenn. 2005) (citing Killingsworth, 104 S.W.3d at 535)). The same concern with economic viability applies equally to appellate attorney's fees.

***Id.*** The Campbells have properly requested attorney fees on appeal. Based upon our finding that the trial court did not err in finding violations of the TCPA, we find it is appropriate to award the Campbells attorney's fees for this appeal. Consequently, we remand to the trial court for a determination of attorney's fees on appeal.

For the foregoing reasons, we affirm the decision of the trial court and remand for a determination of attorney's fees. Costs of this appeal are assessed against the Appellants, William H. Teague and William T. Teague d/b/a Teague Construction, and their surety.

_____

J. STEVEN STAFFORD, JUDGE