**H. Leonard ISAACS and wife, Ann Isaacs, Petitioners-Plaintiffs,**

v.

**Zolton BOKOR and Bokor Enterprises, Inc., Respondents-Defendants.**

Supreme Court of Tennessee.

May 1, 1978.

Louis Farrell, Jr., John T. Conners, Jr., Nashville, for petitioners-plaintiffs.

John W. Wagster, John J. Hollins, Nashville, for respondents-defendants.

## OPINION

HARBISON, Justice.

In this case the petitioners sued respondent [1] claiming damages for alleged tortious misrepresentations and also seeking rescission of two transactions between the parties. Petitioners purchased from respondent a lot in a subdivision of which he was both the owner and the developer. Subsequently, under a separate agreement, respondent had begun to construct a residence for petitioners when it was discovered that the building site was outside the lot which they purchased. Respondent counterclaimed for the unpaid balance of the construction contract, and impleaded as a third-party defendant an architect employed by the petitioners to design their residence and to supervise its construction.

The case was tried to a jury, which found the issues in favor of the petitioners and awarded them $50,000.00 in compensatory damages and $37,500.00 as punitive damages. In its verdict the jury also awarded rescission to the petitioners. Judgment in accordance with the verdict was entered by the trial judge, conditioned upon execution by petitioners of a proper warranty deed, reconveying the property to respondent. The counterclaim of respondent and his third-party action were dismissed by the jury. On post-trial motion, however, the trial judge, while approving the verdict in favor of petitioners, set aside the verdict in the third-party action and awarded respondent a new trial against the architect. That action is not involved on this appeal.

Respondent appealed to the Court of Appeals. That court reversed and remanded for a new trial, holding that the jury instructions were insufficient, particularly in omitting any reference to contributory fault on the part of the petitioners. This Court granted certiorari to give further consideration to the issues involved.

There were many disputed issues of fact and sharply conflicting testimony at the trial. Many of the basic and controlling facts affecting the rescission aspects of the case, however, were virtually undisputed.

Respondent is a trained engineer, but for many years he has been engaged in the development and sale of residential subdivisions in the Nashville area. During the 1960s he purchased several tracts of extremely hilly and rugged land in the southern part of Davidson County in the suburban city of Oak Hill. Respondent platted and subdivided his property in sections. The property which is the subject of this litigation was shown as Lot No. 31 on the Plan of Bokor Heights, Section 4, as recorded in the Register's Office of Davidson County.

Lot 31 was situated high in an extremely uneven and hilly area. It lay at the north end of a cul-de-sac, known as East Hillview Drive, which was the only public road or access to it and to several other lots in the subdivision. The cul-de-sac terminated in a circular turn-around, and Lot 31 fronted 68.23 feet on the northeasterly end thereof. The westerly line of the lot ran 229.76 feet north from the street, and the southerly line ran 211.82 feet to the east. The easterly line was 272.37 feet, and the lot measured 210 feet on the northerly, or rear, line.

Petitioners were interested in purchasing a hillside lot with an attractive view of the surrounding countryside. They learned of respondent's development, and looked at Lot 31 several times before purchasing it. Respondent gave them a copy of the recorded plat, showing the location and dimensions of the lot. While there is conflicting testimony on the point, there was material evidence from which the jury could find that respondent, Mr. Bokor, personally walked some of the lot lines with the petitioners and accompanied them to a very

1. Petitioners sued respondent Mr. Bokor individually and also sued a corporation of which he was president. None of the parties has contended that there are any differences in the rights or liabilities of the two respondents, and they have been treated as a single entity for purposes of this opinion.

attractive building site, with a magnificent view to the south and southeast, in the vicinity of several large and beautiful forest trees.

All parties agreed that the lot sloped sharply to the northwest from a "saddle" or knoll lying east of the street. The point which was selected by the petitioners as the site for construction of their home afforded the only desirable or practical location for a residence with a view to the south and southeast. A rugged range of hills ran to the north and west, affording little or no view, and to the south and east from the building site the property sloped abruptly in a steep grade, at points being an almost vertical bluff. When petitioners were shown the property, all parties agreed that foliage was very heavy and visibility quite difficult, rendering it virtually impossible for a person to see from one corner of Lot 31 to any other corner, or for one standing in the center portion of the lot to see the lot lines and corners.

Although the parties disagree as to the details of what they said and did, it appears almost beyond dispute from the evidence that both the petitioners and the respondent assumed and honestly believed at all times material to the execution of the two contracts between them, that the building site selected by petitioners lay within the boundaries of Lot 31. There can be no question from their testimony that the petitioners would not have purchased the property otherwise. It is also clear that Mr. Bokor intended to sell the petitioners his Lot 31, to build them a residence within its borders, and that he believed that the site selected by them was so situated.

It further appears without dispute that this building site does not lie within Lot 31, but is completely outside its perimeters and is on the northwesterly portion of adjacent property owned by John C. Hailey.

Petitioners were clients of a professional architect, Robert W. Doran. The record shows that Mr. Doran visited the property with petitioners before they signed a contract to purchase it on June 11, 1974. The lot was deeded to them on July 23, 1974. In the interim petitioners entered into a written contract with their architect, dated June 21, 1974, in which he agreed to prepare plans and drawings, and to supervise the construction of the residence.

The description of the property contained in the warranty deed conforms to that on the recorded plat. Respondent was not obligated or requested to furnish petitioners a boundary or topographical survey, although their architect advised them prior to the closing of the sale that a survey would be desirable. On several occasions thereafter he stated that he particularly needed a topographical survey in order to design the residence. No such survey was ever furnished to the architect, the testimony indicating that the petitioners were unwilling to incur the cost thereof and saw no need of it in view of the fact that Mr. Bokor had furnished them a copy of the recorded plat together with a preliminary topographical sketch which he had obtained when he acquired and developed the subdivision. It appears, however, that this topographical information was of little value to the architect, since it did not show the property lines and was very general in nature. The proof also shows without contradiction that under the contract documents executed by the parties, it was the obligation of the owners, not the contractor, to furnish all surveys at their expense and that it was the obligation and responsibility of the architect properly to situate and locate the structures within the boundary lines of the property in such a way as to meet all building setback lines and other restrictions pertaining thereto. There is also evidence, however, apparently accredited by the jury, that Mr. Bokor made statements to the petitioners and to the architect suggesting that a survey was unnecessary and that the architect could "eyeball" the elevations and height of outside walls.

After petitioners, Mr. and Mrs. Isaacs, had acquired the lot, for which they paid $18,000.00, their architect prepared preliminary plans and took bids from a number of contractors for the construction of the residence. Most of the bids ran substantially in

excess of the amount which petitioners were willing to expend, but respondent, Mr. Bokor, submitted a bid, which, with some revisions, was accepted, at a figure of approximately $105,500.00. A contract was let to him, and construction commenced about October 15, 1974.

In order to make Lot 31 accessible to the street, it was necessary to construct a road or driveway into the property, and a substantial amount of filling was required in order to bring this drive up to usable grade.

The architect, Mr. Doran, with the assistance of the petitioners, staked out the site for the residence. Under date of September 4, 1974 he prepared a general site plan. This document shows the house as being well within the perimeters of Lot 31, and shows a driveway leading from the street to the building area. It also shows a gazebo, to be constructed about 150 feet east of the residence.

Work proceeded on the roadway and site preparation for the residence, including the erection of retaining walls, until December 14, 1974. On that date Mr. Hailey advised Mr. Bokor that he had discovered that the construction site was on Hailey's land. Mr. Bokor reacted with disbelief, but advised the petitioners on that evening of his conversation with Mr. Hailey. On December 16, 1974 Mr. Hailey wrote the petitioners and the respondent that the improvements were being built on his property, and the record shows that he verified this information through a surveyor. Investigation by the parties confirmed Mr. Hailey's contentions, and construction was stopped immediately. Respondent negotiated with Mr. Hailey, and received from him an offer to sell the portion of his property on which construction had commenced for the sum of $7,500.00. Neither Mr. Bokor nor the petitioners, individually or jointly, saw fit to make this purchase. Thereupon petitioners, through counsel, promptly notified Mr. Bokor that they considered both their contract of purchase and the building contract to be rescinded by reason of his misrepresentations to them of the location of the building site. They demanded restitution of all sums which had been paid to him and of all other expenses which they had incurred incident to the contracts, including interest on borrowed money and fees of the architect. Mr. Bokor declined to make restitution or to consider either of the contracts rescinded, and he refused tender of a reconveyance of Lot 31.

Petitioners then filed this action for damages, and renewed in their pleadings their offer to deed Lot 31 to Mr. Bokor, upon recovery of their damages. Respondent denied making any misrepresentations to petitioners, elected to treat both contracts as being in full force and effect, and sued for the unpaid balance of the building contract, although construction of the residence had barely begun. His claim was not confined to loss of profits, nor did he seek any accounting from petitioners for rental or use value of Lot 31 or contend that they had failed in any way to tender full restitution to him in the event the contracts were rescinded.

As previously stated, there were conflicts in the testimony of the parties and of their witnesses, and issues of weight and credibility to be resolved by the trier of fact. By their verdict, the jury resolved these issues favorably to the petitioners, and there was material evidence to support the conclusions inherent in their verdict that both transactions between the parties should be rescinded and the petitioners made whole.

The amount awarded to petitioners as compensatory damages was $50,000.00. They introduced testimony, without objection, that they had expended $50,846.81 for the purchase of the lot, progress payments made to the builder, interest on borrowed money and other incidental expenses. The amount awarded by the jury was some $800.00 less than the total submitted for their consideration. While the award was perhaps liberal, none of the items of damages claimed by petitioners was contested or objected to. Respondent did contend that any award made to petitioners should be reduced by their contributory fault, particularly their failure to obtain and furnish the necessary survey to their architect, but

primarily the defense consisted of denial of misrepresentations and a claim that ultimate responsibility for the losses incurred by petitioners lay with them and their architect, not with respondent.

The third-party claim of respondent against the architect is still pending and will be separately heard at its re-trial. Therefore we think it unnecessary to discuss it in detail. The record does show that, for whatever reason, the architect located the foundation of the residence in such a manner that its nearest point to the access street was 297 feet. The minimum setback was only seventy-five feet. The driveway curves across the southerly portion of Lot 31 and thence northeasterly onto the Hailey property. The length of the drive is not shown in the record, but it exceeds the distance between the western end of the residence and the street.

From the record, it can be discerned how the mistake as to site location could have occurred. The rear, or northerly, line of Lot 31 measured 210 feet between two concrete markers or monuments. By coincidence, the northerly, or rear, line of Mr. Hailey's adjacent property also measured 210 feet between two concrete markers. Because of the steeply sloping and rugged terrain, apparently petitioners and their architect, in trying to re-trace and locate the lines of Lot 31 as shown on the recorded plan, must have walked and measured Hailey's rear lot line, rather than the north line of Lot 31. By tape, they measured the distance between the two markers on Hailey's property. They assumed this to be the rear line of Lot 31, and did not check either of the presumed sidelines by actual measurement. Subsequent surveys show that they in effect assumed the lot to be a parallelogram running from the southerly line of Lot 31 on the recorded plan to the northerly line of Hailey's property, rather than the general rectangle formed by the actual lot boundaries.[2] As previously stated, however, petitioners testified that they were walking in an area shown to them by Mr. Bokor, and it was because of this mistake as to where the markers were located that they believed their site to lie within the boundaries of Lot 31.

The principal cross-assignments of error by respondent deal with jury instructions given at the trial. Although these were rather brief, the nature of the relief being sought by the petitioners must be considered. Since many of the controlling facts were undisputed, the issues to be resolved by the jury were fairly narrow and we find that the major issues, particularly with respect to rescission for mutual mistake, were sufficiently covered by the instructions given that no reversible error materially affecting the verdict was committed.

Although the action was brought for the tort of misrepresentation, petitioners also sought a determination of their right to rescind their contracts. This was made necessary because respondent had refused to acquiesce in their declaration of rescission upon discovery of the error in site location, and had himself reaffirmed and insisted upon the continued force and validity of the agreements. Under these circumstances it was necessary for the petitioners to seek a judicial determination of rescission, as well as an award of damages from the alleged mistake and from rescission if granted.

■ A purchaser who has been the victim of a misrepresentation or who has been induced to contract through a mistake of material fact mutual to him and his vendor, is afforded by courts both of law and equity with a number of alternate remedies, including actions for rescission and restitution, actions for breach of contract and actions in tort for misrepresentation. See generally 12–13 Williston, Contracts §§ 1469, 1523, 1542, 1598 (3d ed. Jaeger 1970); 5 Corbin, Contracts §§ 1105 et seq. (1964); 37 Am.Jur.2d, Fraud and Deceit §§ 327 et seq. (1968). All that the law requires of such a purchaser is that he elect consistently among the remedies available to him. Of course, by his conduct he may not both affirm and at the same time disaf-

2. See sketch appended to this opinion.

firm his contract. *See Lamborn & Co. v. Green & Green*, 150 Tenn. 38, 51, 262 S.W. 467, 470–71 (1923); 12 Williston, *Contracts* § 1528 (3d ed. Jaeger 1970). We do not find that petitioners have done this, and we find that they, through counsel, have at all times elected to treat the two contracts involved as rescinded and to pursue a remedy for damages at law, rather than seek similar relief which might have been available to them in equity. However, we have already pointed out that it was also necessary for them to seek a judicial declaration of their right to rescission because of the denial thereof by respondent.

In its opinion, the Court of Appeals indicated that rescission may not be a proper remedy for a contract which has been partially executed, and it also indicated that damages recoverable upon a declaration of rescission are limited to the purchase price paid for the property. These rules are not necessarily applicable in all cases, nor are we able to sustain the conclusion of the Court of Appeals that "contributory negligence" was a mandatory jury instruction particularly as to the claim for rescission.

While it is true that the present action was cast partly as one for tort, there were material allegations seeking rescission and restitution. In the area of the law involving the rights of vendor and purchaser of real property, considerations of restitution and rescission are relevant, as well as the more limited and familiar elements of a tort action for fraud and deceit or those involving negligent misrepresentation. Petitioners in this action did not seek merely damages for loss of bargain afforded in tort actions.[3] Damages in such actions are awarded consistently with an election to affirm a contract and to keep its benefits, but to claim compensation for a difference in value. *See* 12 Williston, *Contracts* § 1524 (3d ed. Jaeger 1970); 37 Am.Jur.2d, *Fraud & Deceit* § 332 (1968). Here petitioners sought to have the court uphold their right to declare their contracts rescinded entirely; consistently therewith, they tendered a reconveyance of the property which they had purchased, together with such part of the improvements as rest thereon, principally the roadway and fill above referred to. They sought full restitution to themselves and to cast upon respondent all of the costs and expenses incident to the construction which had taken place on the Hailey property.

It is true that generally a purchaser who has been the victim of either fraud or mistake, upon rescission, is allowed to recover the consideration or purchase price which he paid for the property. In very many cases, that is the only amount involved. *See Simmons v. Evans*, 185 Tenn. 282, 206 S.W.2d 295 (1947), where earlier cases are quoted as stating that the purchase price is "the measure of damages on rescission." *See also Southern Brass & Iron Co. v. Exeter Mach. Works*, 109 Tenn. 67, 74, 70 S.W. 614, 615 (1902) (personal property).

It does not necessarily follow, however, that because refund of the purchase price is a common measure of damages upon rescission, it is the only amount which can ever be recovered by the complaining party.

It is true that in the very early case of *Peyton v. Butler*, 4 Tenn. 140 (1816), the purchaser of property was not allowed recovery for expenditures in erecting a furnace and other buildings after he had been induced to purchase property by fraud. He was allowed complete rescission of the contract, a refund of the portion of the purchase price which had been paid and cancellation of any unpaid balance. He was also allowed indemnification in the event the vendor had negotiated purchase money notes to third parties. The opinion does not state whether the improvements involved were actually placed on the property conveyed or on other lands belonging to the purchaser. In all events, the damages claimed in that case were deemed to be too remote to be allowable in an action for rescission.

In later cases in this state, however, a rescinding purchaser has frequently been

---

3. *See Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228 (Tenn.App.1976).

permitted to recover not only the purchase price but also the value of the permanent improvements. In the case of *Masson v. Swan*, 53 Tenn. 450 (1871), the vendor sold the purchaser a vacant lot by an oral contract. The purchaser took possession, constructed a residence and occupied the premises for three years. He made no payments on the purchase price. After the death of the vendor, the vendee filed suit for rescission and claimed from the heirs of the vendor compensation for the value of the improvements made upon the property. Since the contract was oral, it was held to be voidable, and the vendee was allowed the relief sought, subject, however, to accounting for the reasonable rental value for his use and occupation of the property. Adjustments were also required because of taxes during the period of occupancy. To the same effect was the holding in *Smithson v. Inman*, 61 Tenn. 88 (1872). The trial court in that case disallowed the value of improvements made by the vendee while in possession, but this holding was reversed on appeal. *See also Smoot v. Smoot*, 80 Tenn. 274 (1883), where the vendee was given credit for improvements, not necessarily for their full value, but to the extent that they enhanced the value of the property. Interest was also allowed upon the purchase money which had been paid.

There was neither fraud, mistake nor misrepresentation involved in any of the foregoing cases. In the case of *Mason v. Lawing*, 78 Tenn. 264 (1882), however, rescission was sought because of a failure of title in the vendor. The trial court denied relief because there was no fraud shown. The Supreme Court reversed, however, finding that whether fraudulently or otherwise, the vendor had undertaken to convey without good title. The Court said:

"The chancellor's decree will be reversed and the sale of the land rescinded and set aside, and the cause will be remanded to take an account of the purchase money paid, for which complainant will have a decree with interest, and for the enhancement of the value at the time of the rescission of the sale of the land, by reason of permanent improvements

put thereon by complainant. And complainant will be charged with the value of the rents while he has had the same in his possession, or under his control." 78 Tenn. at 267–268. ·

*See also Sequatchie Coal Co. v. Sunshine Coal & Coke Co.*, 25 Tenn.App. 604, 166 S.W.2d 402 (1942).

In the case of *Bigham v. Madison*, 103 Tenn. 358, 52 S.W. 1074 (1899), a purchaser sought rescission where the seller's title failed to a material portion of the land deeded. Before discovery of the title failure, the purchaser had cut timber and had also made improvements upon that part of the land which he was later forced to surrender to a third party. Because the complainant had surrendered the property without suit, he had been denied relief in the lower courts; they had also based their decision partly upon a finding that the seller had not been guilty of actual fraud or deceit.

Reversing the Court of Chancery Appeals, this Court stated:

"We grant that its finding is conclusive that there was no false and misleading representations made by the defendants, known to them to be false, and hence, no actual fraud; but the facts as found by it make out a clear case of mutual mistake as to the location of the lines,—a matter material to the contract, not only as to the quantity of land, but as to the location of the lines, and the specific lands the vendors thought they were selling and the vendee thought he was buying, and which were pointed out." 103 Tenn. at 362, 52 S.W. at 1075.

The Supreme Court ordered rescission of the contract, and remanded the case in order

" . . . that the rights of the parties may be adjusted upon such rescission in view of the improvements put upon the land, etc." 103 Tenn. at 367, 52 S.W. at 1076.

In the case of *Lebovitz v. Porter*, 36 Tenn.App. 149, 252 S.W.2d 144 (1952), a contract between the vendor and purchaser

of a going business and the real property on which it was situated was found to be unenforceable for failure of title in the vendor. The purchaser, however, was allowed to recover, not only the amount which he had paid to the seller toward the purchase price, but also the business debts which he had paid and the value of improvements which he had incurred in placing the property into operable condition.

It is true that most of the foregoing cases were suits in equity rather than actions at law. It is well settled, however, that a court of law may decree rescission and allow restitution, as well as a court of equity. *See Glover v. L. & N. R.R.*, 163 Tenn. 85, 40 S.W.2d 1031 (1931); *Memphis Street Ry. v. Giardino*, 116 Tenn. 368, 92 S.W. 855 (1906); *Brundige v. N. C. & St. L. Ry.*, 112 Tenn. 526, 81 S.W. 1248 (1903); *Winters v. Floyd*, 51 Tenn.App. 298, 367 S.W.2d 288 (1963); Caruthers, *History of a Lawsuit* 311 (8th ed. Gilreath 1963); 13 Williston, *Contracts* § 1598 (3d ed. Jaeger 1970); 3 Corbin, *Contracts* § 613 (1960); 37 Am.Jur.2d, *Fraud and Deceit* § 335 (1968). It is usually a requirement in an action for rescission and restitution at law, that the vendee, as in the instant case, make an offer of restitution prior to filing suit. *See* Restatement, *Restitution* § 65(d) (1937).

In view of the foregoing, it is too narrow a view to state that a vendee, upon rescission, is limited strictly to the purchase price which he paid for the property. Where he has changed his position and made improvements, he may well be entitled to recover for their value, although, in attempting to restore the parties to their former status, courts may require the vendee to account to the vendor for the use or rental value of the property, to convey improvements to him, and to restore to the vendor anything of value which the vendee has received from him in the rescinded transaction. *See* generally 77 Am.Jur.2d, *Vendor and Purchaser* § 574 (1975); 92 C.J.S. *Vendor and Purchaser* §§ 292, 544 (1955); 17 Am.Jur.2d, *Contracts* §§ 512 et seq. (1964); 66 Am.Jur.2d, *Restitution and Implied Contracts* § 10 (1973); 5 Corbin, *Contracts* §§ 1105 et seq. (1964); *Restatement of Restitution* §§ 66 et seq. (1937); Annot. 48 A.L.R. 12, 64–68 (1927); 68 A.L.R. 137, 151 (1930).

The trial judge adequately instructed the jury as to recoverable damages in submitting petitioners' claim for rescission for mutual mistake, and we find no reversible error in that regard.

"Contributory negligence" may, of course, be a complete defense or at least a mitigating factor in tort actions for damages based solely on a theory of negligent misrepresentation. *See Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (1970). That case, however, did not involve a claim for rescission of any contractual agreements.

In actions for actual fraud and deceit, contributory fault of the victim generally is not considered a defense. *Bevins v. Livesay*, 32 Tenn.App. 1, 8, 221 S.W.2d 106, 109 (1949); 37 Am.Jur.2d, *Fraud and Deceit* §§ 250, 385 (1968).

While the reasonableness of the conduct of a purchaser of land may on some occasions be a basis for denying him relief where there has been a mutual mistake of a material fact, this is ordinarily not the case, and generally such a purchaser may obtain rescission even though the mistake was partly due to his own fault or that of his agent. *See generally* 3 Corbin, *Contracts* § 606 (1960).

As indicated in several of the cases cited earlier in this opinion, the purchaser of land usually is entitled to rely upon the vendor's representations as to its boundaries. *See Bigham v. Madison*, 103 Tenn. 358, 52 S.W. 1074 (1899). The case of *Wilson v. Mid-State Homes*, 53 Tenn.App. 520, 384 S.W.2d 459 (1964), involved a claim for rescission or for damages because of a mistaken boundary line. There the Court said:

"In other words, if the defendant knew when the contract was signed that the fence behind the house was on the other man's property and that the stake described in the contract was not the true

corner, then this amounted to a misrepresentation and fraud on the complainant. On the other hand, if both the defendant and complainants acted on the assumption that the stake referred to in the contract was the correct location of the corner and proceeded on that basis, it was a mutual mistake.

"We are convinced that the equities in this case necessitate either rescission of the contract or the awarding of such damages to the complainants as the facts and circumstances will warrant." 53 Tenn.App. at 531, 384 S.W.2d at 464.

■ Mistakes as to the existence of title, boundaries, quantities and conditions of land have been the source of frequent litigation. Relief by way of rescission or adjustment of the purchase price usually is granted where there is a material mistake as to the identity of property, and the rules of "contributory negligence" applied in tort actions generally are not held applicable. *See generally* 3 Corbin, *Contracts* § 604 (1960); 13 Williston, *Contracts* §§ 1566A, 1596 (3d ed. Jaeger 1970). As stated by Corbin, when the purchaser is mistaken as to the land he intends to buy:

"If the written description is clear and accurate, the purchaser's mistake may have been negligent in failing to read it at all or in failing to observe that it does not describe the tract he means to buy. Often, however, the discrepancy between the written description and the land he has in mind cannot be determined by merely reading the description. It may require the examination of other documents or records and an inspection of the ground itself. Even by these methods, identification may not be easy. Generally, the purchaser's error is due to the fact that he looked at the wrong tract. The wrong tract or the wrong boundary lines, may have been pointed out by the vendor or his representative. Whether this last is the case or not, the purchaser usually is held entitled to rescission, with mutual restitution if performance has occurred. Mistake as to identity of the land is a material and vital mistake." 3 Corbin, *Contracts* § 604 (1960).

Where there is a material misrepresentation by the vendor, the courts have been even less stringent in requiring the vendee to make an independent investigation or inquiry concerning boundaries, area and the like. *See* W. Prosser, *Law of Torts* 717–718 (4th ed. 1971); 3 Pomeroy, *Equity Jurisprudence* § 895 (5th ed. 1941); 37 Am.Jur.2d, *Fraud and Deceit* § 208 (1968).

■ After reviewing the evidence in this case, we can reach no conclusion but that there was a serious and mutual mistake of fact by all persons involved—petitioners, respondent, and the architect—to the effect that the site selected for construction of the residence lay within the borders of Lot 31. Accordingly there was abundant proof to support a finding that the petitioners were entitled to a rescission of both the sales contract and the building contract, and to restitution. Under the facts shown, it would be harsh if not entirely unconscionable to require them to pay to the builder the amount sought in his counterclaim against them.

We have concluded that there was material evidence to support the verdict of the jury with respect to the compensatory award made to the petitioners. Accordingly we reverse the judgment of the Court of Appeals in setting it aside and reinstate it. Regardless of the tort claim, the rescission action was clearly made out, and the verdict should be applied to it. T.C.A. § 20–1317.

On the other hand we are of the opinion that there was no evidence whatever of deliberate fraud or deceit on the part of Mr. Bokor, so as to justify an award of punitive damages against him under the circumstances of this case. His motion for peremptory instructions, made at the conclusion of all the evidence and properly preserved at all post-trial and appellate stages of the case, is sustained insofar as the award of punitive damages is concerned, and the suit is dismissed in that regard.

The judgment of the Court of Appeals is reversed. The judgment of the trial court is reinstated, to the extent of the compensatory award and of rescission. Respondent

will be entitled to a reconveyance of Lot 31 to him upon payment of the judgment and otherwise complying with the orders of the trial court. The judgment of the trial court is reversed and the suit is dismissed upon directed verdict as to the claim for punitive damages. Costs incident to the appeal will be divided equally between the parties.

Costs in the trial court will be as adjudged there. The cause is remanded to the Circuit Court of Davidson County for such further proceedings as may be necessary, including re-trial of the third-party action.

HENRY, C. J., and COOPER, FONES and BROCK, JJ., concur.