IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 4, 2011 Session

## SENIOR HOUSING ALTERNATIVES, INC. v. BERNARD GLOBAL LOAN INVESTORS, LTD.

**Appeal from the Chancery Court for Hamilton County**
**No. 09-1065       W. Frank Brown, III, Chancellor**

**No. E2010-01964-COA-R3-CV-FILED-JUNE 28, 2011**

Senior Housing Alternatives, Inc. ("the Borrower") filed this action against Bernard Global Loan Investors, Ltd. ("the Secured Party") asking the trial court to enjoin the Secured Party from foreclosing on a deed of trust that secured several notes on which the Borrower had defaulted. In essence, the Borrower's complaint alleges that its original lender had defrauded the Borrower and inflated the balance owed on the notes and that the Secured Party had knowledge of the fraud when it took ownership of the notes and deed of trust. The complaint alleges that the merits of the case are at issue in a federal district court in Georgia. Despite expressing reservations about the Borrower's ability to prevail on the merits, the trial court granted it a temporary injunction to preserve the status quo in an order entered February 15, 2010. The court noted that developments in the federal court action could affect the equities and set a hearing for August 13, 2010, to "review the entire matter." Two days before the hearing date, the Secured Party filed a brief, with supporting affidavits, asking the court to dissolve the injunction. The court heard proof at a status conference and thereafter issued a memorandum opinion explaining that it was dissolving the injunction because, among other things, the court did not believe the Borrower could prevail on the merits. The Borrower appeals from the order dissolving the injunction and dismissing the complaint. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

David R. Evans, Chattanooga, Tennessee, for the appellant, Senior Housing Alternatives, Inc.

Bruce C. Bailey, Chattanooga, Tennessee, and David A. Rabin, Atlanta, Georgia, for the appellee, Bernard Global Loan Investors, Ltd.

**OPINION**

I.

A.

The Borrower is in the business of furnishing innovative housing for senior citizens. The Borrower's system is innovative in that it offers the residents a wide range of services, including meals , and focuses on rehabilitation of the residents rather than just making them comfortable. The system has shown promise. The Borrower's facilities ("the Facilities") are located at 825 Runyan Drive, Chattanooga. The Facilities include 140 residential units plus recreational areas, kitchens, dining rooms and therapy rooms, situated on approximately six acres of land.

Funding for the project, including the purchase of the real property and renovation of the Facilities, was provided by Cornerstone Ministries Investments, Inc. The original lending documents dated on or about June 30, 2003, consisted of a "Secured Real Estate Note" in the amount of $5,000,000, a "Closing Statement" that listed money advanced totaling $2,951,436.80, a "Tennessee Deed of Trust and Security Agreement," and an "Absolute Assignment of Leases, Rents, and Profits." The difference between the $5,000,000 note and the money advanced at closing – approximately $2,000,000 – was to be paid to the Borrower in draws as needed in the manner of a line of credit. After using the full line of credit, the Borrower executed two additional notes, the first in the amount of $1,000,000 and the second in the amount of $214,001. Cornerstone, the Borrower, and the trustee on the deed of trust executed "amendatory" agreements, the result of which was to secure all advances by way of the deed of trust and the assignment of rents. The amendatory agreements all included the following language:

> *[The Borrower] hereby* (i) ratifies and affirms all of its obligations under the Note . . . and Loan Documents as modified and amended hereby; (ii) *acknowledges, represents and warrants that the Note, . . . the Deed of Trust and Security Agreement and the Loan Documents constitute valid and enforceable obligations of [the Borrower] as of this date, free from any defenses and claims of offset by [the Borrower]*; and (iii) consents to the modification and amendment of the Note, . . . the Deed of Trust and Security Agreement and Loan Documents as set forth herein . . . .

(Emphasis added.) The third amendatory agreement also extended the maturity date of the

notes to July 1, 2009. The third amendment was executed on or about February 1, 2007. Interestingly, the notes, by their express terms, are governed by Georgia law, whereas the deed of trust and assignment of rents are, by their express terms, governed by Tennessee Law.

In the time frame of July to October 2006, the Borrower's auditor began to question some of the expenses charged by Cornerstone as draws against the line of credit. The auditor's questions prompted the Borrower to ask Cornerstone for an accounting of the charges against the line of credit. The Borrower was "shocked" to learn that some of the charges were payments to the Borrower's then-president, a man named Taylor McGown. Cornerstone advised that the charges were a "mistake" that would be corrected. Thus, the Borrower signed the third amendment confirming the debt, including the waiver of defenses and claims of offset, with knowledge of this "mistake."

Through a series of transactions which need not be described in detail, the Secured Party obtained an assignment of the various lending documents as security on a loan, the proceeds of which ultimately went to Cornerstone. Cornerstone filed bankruptcy in February 2008. Through Cornerstone's default, the Secured Party obtained ownership of the notes and related documentation in a foreclosure sale in November of 2008.

In February 2009, the Secured Party filed an action against the Borrower in the United States District Court for the Northern District of Georgia ("the federal action"). The thrust of the federal action was an action to collect the unpaid balance of the notes executed by the Borrower. The Borrower filed an answer and counterclaim raising the alleged fraud of Cornerstone as a defense and cause of action against the Secured Party. The Borrower asked for punitive damages in the federal action.

It is significant that the Borrower does not seek a determination in the present action of the merits of its claims or defenses asserted in the federal action. The Borrower states at page three of its brief the relationship between the federal action and this action:

> To promote judicial economy and to avoid parallel proceedings covering the same facts, the thrust of [the Borrower]'s action below was to maintain the *status quo* and to then utilize the Federal Litigation to hopefully resolve any contested questions of fact or law, allowing the [Chancery] Court to then utilize principles of collateral estoppel, to the maximum extent permitted, to resolve the action in [Chancery] Court . . . by the entry of appropriate orders following the conclusion of the Federal Litigation.

(Footnote omitted.)

The Borrower claims in this action that the fraud is so pervasive that it cannot be detailed, but offers the following specific "examples" of the fraud practiced by Cornerstone:

1. R.E.E.D. Services, LLC was formed just days before the closing of the Borrower's loan. It is owned by one of the sons of Cornerstone's second in command, Jack Ottinger. One of the charges against the Borrower's line of credit is a $250,000 invoice from R.E.E.D. The invoice is for "acquisition services" however it was not included in the closing statement. Ottinger approved the invoice for payment and instructed that it be charged to the Borrower. At the meeting of creditors in Cornerstone's bankruptcy, Ottinger first stated that the charge was a simple mistake. When confronted, Ottinger admitted that the charge was made up because he and others in Cornerstone wanted the money.

2. Taylor McGown, the officer of the Borrower, received payments from Cornerstone totaling $220,750 that were charged to the Borrower's line of credit. As related above, Cornerstone's position when the payments to McGown were questioned was that they were a simple mistake. Cornerstone's chief internal accountant, Timothy Turner, has supplied an affidavit stating that all of the McGown payments were made with full knowledge of and at the direction of Cornerstone's management team.

3. The Borrower was charged $80,339.94 for out of pocket closing costs. The Borrower has determined that approximately $60,000 of the charges are totally unrelated to the Borrower or its credit line. Additionally, Cornerstone charged the Borrower a $500,000 closing fee. The Borrower concedes that the closing fee was "plainly disclosed" on the closing statement, but argues that it helped to cover up the other improper fees that were not disclosed.

4. The Borrower is being charged 10% interest on the Cornerstone line of credit. In 2006 the Borrower attempted to secure financing with National Cooperative Bank ("NCB") at a rate of approximately 6.5%. The Borrower claims that Cornerstone intentionally blocked the better financing package in two ways. It inflated the balance due on the loan to the point that NCB would not extend financing and it refused to subordinate its first lien and carry a small second mortgage. The Borrower claims this would have made a difference of approximately $1 million.

In addition to all of this, the Borrower alleges in the present action that the charges against the line of credit were not supported by proper documentation such as would allow the Borrower to determine whether or not the charges were legitimate. The Borrower alleges

-4-

that the Secured Party agreed to provide an accounting to be performed by "Ernst & Young, a nationally recognized accounting firm." However, at the time the complaint in the present action was filed, the Secured Party claimed that the Ernst & Young report was privileged. Nevertheless, by the time of the status conference, the Secured Party had relented and supplied the Borrower a copy of the Ernst & Young report.

The Secured Party, for the most part, has not defended Cornerstone's actions. Its position is that Cornerstone's bad acts cannot give rise to liability or defenses with respect to the Secured Party. After the February hearing and before the August status conference, the Secured Party filed a motion for summary judgment in the federal action. As part of its filing, the Secured Party disclaimed any right to recover the proceeds of Cornerstone's alleged fraud. According to the Secured Party's brief filed in the federal action, which was introduced in the chancery court by affidavit,

> [the Secured Party] is now dropping all but one of those [disputed] charges and any associated interest on them from the debt and is suing only for the balance. [The disputed charge that the Secured Party retained is the $500,000 closing fee that was plainly displayed on the closing statement.] In taking this step, [the Secured Party] does not admit that those charges were improper. [The Secured Party] believes that those charges can legally be charged against the loan account. Nevertheless, [the Secured Party] believes that continued litigation over these charges is not worth the associated time, trouble and expense.

According to an affidavit filed in support of lifting the preliminary injunction, the balance owed after eliminating all of the challenged charges and associated interest, is approximately $6.5 million. Attorney's fees claimed by the Secured Party bring the total chargeable to the collateral to approximately $7 million.

In December 2009, Bruce C. Bailey, as substitute trustee on the deed of trust, gave notice of a foreclosure sale scheduled for January 11, 2010. The Borrower then filed the present action to enjoin the sale. The complaint names the Secured Party as well as the substitute trustee as defendants. The trustee was dismissed as a party upon agreeing to be bound by the court's orders and is not a party to this appeal. The complaint alleges that "[t]he debt claimed by [the Secured Party] in the Federal Litigation includes amounts that [the Secured Party] knew or had reason to know were fraudulently and improperly charged to the Loan Account by Cornerstone." The Borrower's position in the federal action, as explained in the complaint in this present action, is as follows:

> In the Federal Litigation, [the Borrower] seeks recoupment, setoff, damages and punitive damages as a result of the deceptive and fraudulent acts and omissions of Cornerstone and [the Secured Party's] continuation and furtherance of the fraud. [The Borrower] has asserted counterclaims in the Federal Litigation of breach of contract, fraud, setoff and recoupment, attorney's fees, and punitive damages. [The Borrower] has also asserted affirmative defenses in the Federal litigation, including, *inter alia*, that Cornerstone and [the Secured Party] are guilty of unclean hands which render the debt . . . and the related Loan Documents invalid and unenforceable.

The complaint demands temporary and permanent injunctive relief "from foreclosure and sale of [the Facilities]" and asks that the court retain jurisdiction over the defendants to "enter such orders and relief as may be warranted to clear title to the [p]roperty from any liens and encumbrances" as may be "appropriate upon the conclusion of the Federal Litigation."

B.

As we have indicated, the trial court granted a temporary injunction. It explained its reasons in a memorandum opinion.

> Three of the four factors that normally are considered by the Court to determine whether to grant a temporary injunction or not favor the Plaintiff, [the Borrower].

> One. Obviously, if the foreclosure occurs, there is irreparable harm to the [Borrower]. They're out of business. They lose their one entity that produces income.

> Two. The balance of the harm to the [Borrower] if no injunction is granted is greater than the harm that would befall the [Secured Party] if the injunction is granted. However, the Court believes that this balancing test is more equalized with the bond that will be discussed later.

> The third factor favoring the [Borrower] obtaining a temporary injunction is the public interest. It certainly is in the public interest that one's debts are paid and that one cannot have his or her cake without paying for it.

-6-

It's also in the public interest that we try to take care of the residents at [the Facilities]. And the Court notes the testimony by I believe it's Mr. Peterson, saying that [the Secured Party] would try to do that. I think, at this point in time, that factor does favor the [Borrower].

The fourth factor is the probability that the [Borrower] will succeed on the merits. However, we can describe that as a mixed bag. . . . .

The Court believes that the [Borrower] may be able to prove some fraudulent transactions by Cornerstone and that [the Borrower] may prove that some payments were not credited to the account properly and that there may be credits for interest paid when these deductions are taken off the account.

However, the Court believes that, based upon the present record, that [the Borrower] will have some difficulty in prevailing on the ultimate issues in this case. There are questions of whether or not the [Borrower] justifiably relied upon certain actions and/or statements by Cornerstone. The [Secured Party] referred to the [Borrower's], quote, blind reliance, which has not been found to be justifiable under Georgia law.

The five-hundred-thousand-dollar origination fee, which is attacked by the [Borrower], was, as the Court understands it, set forth on the original settlement sheet, for all to observe at the closing. [The Borrower] often did whatever Cornerstone asked, evidently without inquiry or question.

In the Court's mind, there is the bigger question regarding the present holder, [the Secured Party]. [The Borrower] would apparently owe approximately six million dollars, even if all of the credits and the monthly compound interest were found to be in [the Borrower's] column at the end of the litigation.

[The Borrower]'s request is somewhat tainted, in that there have been no payments whatever made on the note by [the Borrower] since September 30, 2008. That was the last payment made on

the account, according to Mr. Crowe's affidavit and attachments.

[The Secured Party] obtained this note in October 2008 as a result of a foreclosure it pursued when the money owed it was not paid. Thus, this Court has great doubt that, at the end of the federal litigation, [the Borrower] will prevail in having punitive damages awarded against [the Secured Party] and that the amount of any punitive damages or other credits would wipe out this five- to six-plus-million-dollar balance.

* * *

So it's this Court's position that, on the present record, [the Borrower] will owe [the Secured Party] considerable monies at the end of the federal court litigation. I'm not a prophet. I'm just having to make that decision based on the request for temporary injunction.

However, despite the concerns of the Court about [the Borrower] prevailing completely – when I say completely, enough to eliminate the total debt owed [the Secured Party]– the Court also knows that injunctions are often used to preserve temporarily the status quo and to give people an opportunity to litigate issues.

The issue on how much [the Borrower] owes and what credits and deductions, if any, it's entitled to under the balance due claimed by [the Secured Party] will be decided by the United States District Court in the Northern District of Georgia and not here. Therefore, the Court has decided to allow a temporary injunction to be issued in this case.

C.

After the August hearing, the court explained its reasons for dissolving the injunction as follows:

The issue before the Court today is whether the Court should legally place the temporary injunction, should modify the

-8-

temporary injunction, or should dissolve the temporary injunction.

* * *

. . . [T]here have been developments since the hearing held herein on February 29, 2010. First, [the Secured Party] has turned over to [the Borrower]'s attorneys the Ernst & Young report. Second, the discovery period in federal court has ended. The result of these two facts is that [the Borrower] has no evidence that [the Secured Party] has been guilty of any participation in or wrongdoing with regard to the . . . debt.

The Court sees no evidence that [the Secured Party] itself has unclean hands. [The Secured Party] has done nothing, to this Court's knowledge, that would present any basis for [the Borrower] to obtain a punitive damage award against [the Secured Party].

The third development is that [the Secured Party] has agreed to waive any claims to the portion of the debt that [the Borrower] claims was wrongful. In addition, [the Secured Party] has given credit for all payments [the Borrower] claims it has made to Cornerstone even though such may not have been shown as credits on the Cornerstone records.

The only item not dropped or waived was the original $500,000 origination fee for the loan and line of credit. Origination fees are typically charged in many loan transactions and the charge is clearly set forth in the closing or settlement statement, which was signed by an officer of [the Borrower].

The sum and substance of the testimony received on August 13, 2010, is as follows: First, Mr. Gould said his group would employ Beacon Communities to manage [the Facilities] if the foreclosure is allowed to go forward and [the Secured Party] is a successful or high bidder.

Second, Mr. Johnson testified that Beacon Communities was ready, willing, and able to step in and manage [the Facilities] if

-9-

and when [the Secured Party] became the owner of the organization. Beacon Communities has had some experience in managing companies under such situations when management has changed.

Third, Ms. Reynolds is a certified appraiser. She appraised the value of [the Facilities] at $7.8 million as of April 1, 2010. This appraisal was based upon the year-end statements for [the Borrower] of 2007, 2008, and 2009.

Subsequently, Ms. Reynolds appraised the value of [the Facilities] at $6.5 million as of June 1, 2010. This appraisal was based upon the 2008, 2009, and the first quarter of 2010. The decline in value was due to decreased net operating income, due to decreased rental income, and increased medical costs. Ms. Reynolds admitted that the first . . . quarter of the year is often the worst quarter in the year.

Based on the affidavit submitted by Keith Caldwell, [the Secured Party]'s claim as sanitized is as follows: $5,440,000 and $177. Interest through July 15, 2010, $1,213,599. And [the Secured Party] is claiming attorney's fees under Georgia law of $665,402.60. In addition, the per diem interest is $1,490.46.

[The Secured Party] points out that [it] has been damaged by the granting of the temporary injunction because the value of the collateral has declined and because [the Secured Party] has not received any payments from [the Borrower]. Indeed, [the Secured Party] points out that the payments that the [the Borrower] has paid to the Clerk & Master for the injunction bond are less than the accrued interest per month that is accumulating on the debt.

Everyone talks about the four factors considered by federal courts in granting temporary injunctions or in continuing them. In addition to those factors, often the temporary injunction is granted to maintain the status quo of the situation. Sometimes temporary injunctions are granted to let the smoke clear and the true picture to become clearly focused. Sometimes other

litigation may decide issues, save duplication of effort and make lawsuits moot.

* * *

I do not think there is a substantial likelihood of [the Borrower] prevailing on the merits in the Georgia litigation. One, [the Borrower] cannot show fraud by [the Secured Party] or its participation in any fraud or wrongful conduct. [The Secured Party] has eliminated the disputed charges which the Court would, if found to be true, eliminate. This reminds me of the claim of [the Borrower] in its counterclaim of setoff and recoupment, and in effect [the Secured Party] has done that.

. . . . Whether Georgia law or Tennessee law applies, the Court does not believe that [the Borrower] will be able to obtain a punitive damage award against [the Secured Party].

[The Borrower has] not paid very much at all to Cornerstone Ministries and nothing to [the Secured Party]. I think, if I am correct, that the last payment on the note was made in April of '08, which is well over two years ago.

* * *

If the Court's math is right, . . . the total payments barely exceed the principal sum that was granted to [the Borrower] on the first day in the approximate amount of $2,000,000.

Secondly, the Court does not find that the harm to [the Borrower] will be irreparable. Number one, [the Secured Party] has taken steps to bring in a management firm to manage [the Facilities] if [the Secured Party] is successful in its foreclosure and is the high bidder. Top management would lose their positions and salary, which such often occurs where businesses fail financially. The residents will be cared for by [the Secured Party] and Beacon Communities, Inc., if [the Secured Party] is the high bidder.

-11-

Also, the Court will note that [the Borrower] has a monetary claim or a remedy against [the Secured Party] in the litigation in Rome, Georgia.

The Court – third, the Court does not find the potential harm to [the Borrower] exceeds the harm to [the Secured Party]. The Court was concerned about this and some other factors in February. That matter has been resolved in view of [the Secured Party]'s reduction of its claim and the appearance of Mr. Johnston and his testimony. [The] debt is ever increasing and the [Borrower]'s payment[s] to the Clerk & Master are less than the accrued interest.

The fourth factor is the public policy factor, and to some extent this tied into the patient-care issue. That issue is now no longer a factor in view of Mr. Johnston's testimony.

Certainly, and at least until perhaps recently, some people may say, there was a strong public policy that persons who borrowed money should repay the loan. It's not right for [the Borrower] to have gone almost two and a half years without paying any payment on the loans to [the Secured Party] and its predecessor.

\* \* \*

So basically, even though I had some reservations in February, I had some reservations regarding the patient care, I had some reservations about the disputed charges, those matters have been resolved in the Court's mind.

Most important with regard to the Ernst & Young report and the discovery, that apparently has shown that [the Secured Party] was not knowledgeable of any fraud on behalf of Cornerstone.

Based on the evidence that has now become clear, the Court hereby orders that the temporary injunction issued February 15, 2010, is dissolved. The Court wants to make that a final order and order that [the Borrower] may elect to consider an appeal, if it wants to do that, and for that purpose the Court would in

-12-

effect say that this is the final order, that there is no reason not to make that a final order for appeal.

Thus, the court entered an order dissolving the injunction and dismissing the complaint. The Borrowed filed a timely notice of appeal.

The Borrower filed a motion with the trial court asking it to stay the effect of its judgment pending appeal. The trial court entered an order granting the stay conditioned upon the Borrower posting a bond in the amount of $1,275,000. The Borrower filed a motion asking this court to reduce the bond. We declined. The Borrower then filed bankruptcy. Upon receiving notice of the bankruptcy, we filed an order allowing the case to proceed. At oral argument, both parties agreed that the bankruptcy does not prevent this case from going forward to final judgment. Nevertheless, foreclosure is presently stayed by the bankruptcy regardless of the our holdings in this case.

II.

We agree with the Secured Party that the dispositive issue is whether the trial court abused its discretion in dissolving the temporary injunction that it had previously granted. Nevertheless, it will be helpful for discussion purposes to list verbatim the issues as stated by the Borrower:

> What is the appropriate standard of review on appeal?
>
> Whether the Lower Court erred by dissolving the stay and ruling that [the Borrower] did satisfy the requirements for a stay?
>
> Whether [the Secured Party] is a holder-in-due-course of a negotiable instrument?
>
> Whether the [Secured Party]'s right to non-judicial foreclosure was barred by applicable Tennessee law?
>
> Whether the Notes sought to be enforced by the [Secured Party] . . . are enforceable?
>
> Whether the Lower Court erred by failing to apply Tennessee law to the Deed of Trust at issue herein?

Whether the Lower Court erred in determining that there were changes in the facts of applicable law which warranted dissolution of the previously issued stay?

If this Court reinstates the stay on appeal, should more than a nominal bond be required?

(Paragraph numbering omitted.)

III.

Despite the Borrower's contentions to the contrary, there can be no doubt that a trial court's decision granting or denying injunctive relief is reviewed for abuse of discretion. *Gentry v. McCain*, 329 S.W.3d 786, 793 (Tenn. Ct. App. 2010). Under this deferential standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." *Id*. (*quoting* *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted, brackets in original). Further,

> [a] trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision."

*Id*. (*quoting* *DeLapp v. Pratt*, 152 S.W.3d 530, 538 (Tenn. Ct. App. 2004)).

> The most common description of the standard for preliminary injunction in federal and state courts is a four-factor test: (1) the threat of irreparable harm to plaintiff if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant; (3) the probability that plaintiff will succeed on the merits; and (4) the public interest.

*Id*. (*quoting* Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 4–3( 1 ) (1999)).

IV.

With these pronouncements behind us, we will briefly address the Borrower's mistaken contention that the *de novo* standard of review is the proper standard for this case. The Borrower ties its position to the trial court's dismissal of the complaint, and cites opinions which discuss dismissals of cases as a matter of law. *See Marceaux v. Thompson*, 212 S.W.3d 263, 266 (Tenn. Ct. App. 2006)(dismissal for failure to state a claim is reviewed *de novo*); *Blair v. West Town Mall*, 130 S.W.3d 761, 763(Tenn. 2004)(summary judgment is reviewed *de novo* as a question of law). The critical difference between those cases and the present case is that the only substantive relief sought in the present case is injunctive relief whereas the cited cases sought other forms of relief. If the trial court correctly exercised its discretion in denying injunctive relief, the only substantive relief sought, there could be no error of law in dismissing the complaint.

We are aware that the complaint also asks the court to retain jurisdiction to enter such orders as may be appropriate upon termination of the federal action, but we do not consider that request to be ripe for a decision so as to state an actionable claim regarding a live controversy. *See City of Memphis v. Shelby County Election Commission*, 146 S.W.3d 531, 539 (Tenn. 2004). Issues which are based on contingencies which may or may not happen are not ripe for adjudication. *Id.* The Borrower has furnished no reason to believe that the Secured Party will not follow the rulings of the federal court and agree to whatever relief is required by its orders. The need for further orders to enforce the judgment rendered in the federal action is, at most, a contingent possibility. The gravamen of this present action is an action for injunctive relief. Therefore, we hold that the appropriate standard of review is abuse of discretion.

The Borrower's second and seventh issues strike at the heart and soul of the case. The Borrower's "take" on these issues is that the trial court correctly granted an injunction in February and that it erred in dissolving the injunction in August. We disagree, at least on the latter point. One problem with this argument is that it ignores the discretion of the trial court. By the very definition of our standard of review, if the trial court takes into account applicable law "consistent with the facts before the court," its decision will be upheld even if "reasonable judicial minds can differ" as to the outcome. *Gentry*, 329 S.W.3d at 793 (*quoting DeLapp*, 152 S.W.3d at 538). There is certainly enough leeway in this discretionary standard for a trial judge to be lenient in favor of granting an injunction in the context of an initial hearing when not much is known about the ultimate merits of the case, and then taking a harder look at the merits as more becomes known. That is exactly what happened in the present case. It is apparent that the trial court had strong doubts about the merits of the Borrower's position from the outset, but exercised its discretion in a way that gave the

Borrower an opportunity to either save its Facilities by securing financing or developing proof of fraud imputable to the Secured Party. It did neither.

A second problem with the Borrower's position is that it ignores the proof that shifts the "public interest" factor in favor of the Secured Party. There can be no doubt that the public has an interest in seeing that loans are repaid. Our entire system of free enterprise is built on this principle. Bankruptcy is an exception we live with and not the rule. Also, the trial court expressly found that the residents of the Facilities will continue to be served in the event of a foreclosure because the Secured Party intends to purchase the Facilities in foreclosure and hire a management company with experience in the field of senior care. This finding turns, at least in part, on witness credibility and is entitled to great deference. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Findings which turn on credibility will not be reversed "absent clear and convincing evidence to the contrary." *Id*.

Further, any harm to the Borrower is the subject of damage claims in the federal action as the trial court observed. Where there is a full, complete, and adequate remedy at law for a wrong, such as damages, the harm therefrom is not irreparable. *Fort v. Dixie Oil Co.*, 95 S.W.2d 931, 932 (Tenn. 1936).

Finally, the Borrower's position ignores some very sound reasoning by the trial court with regard to the probability of the Borrower prevailing on the merits of the case. The most that can be said as to the "wrongdoing" of the Secured Party is that when it purchased the notes from Cornerstone's assignee, it knew that Cornerstone had defrauded the Borrower. The Secured Party has now disclaimed in the federal action any right to recover money from the Borrower that accrues from the wrongdoing. Still, after subtracting the ill-gotten gains, the Borrower owes approximately $7 million on a property that was most recently appraised at approximately $6.5 million. Thus, in order to prevail on its monetary claims, the Borrower must convince a trier of fact to award it $7 million in punitive and compensatory damages on a compensatory claim that is at most in the range of $2 million. Experience and reason teaches that such a recovery is not "likely" in a case where the real culprit is not the defendant, here the Secured Party.

One of the Borrower's arguments is that Cornerstone's fraud "vitiates" the contract. Even if that is true, at most it would give the Borrower the choice of rescinding the deal or recovering damages. *Isaacs v. Bokor*, 566 S.W.2d 532, 537 (Tenn. 1978)(victim of misrepresentation may not both affirm the contract and keep all its benefits and disaffirm). We have already discussed the outcome if the Borrower elects the remedy of damages. If the Borrower elects recission of the contract, then the goal becomes to restore the parties to the positions they were in before the contract, as if it never existed. *Id*. at 540. Therefore, even if the Borrower pleads and pursues the remedy of recission in the federal action, which the

Secured Party represents it has not done, it must restore the moneys that it received as a benefit of the contract. *Id*. at 540. This takes us back to the same point that we were at before; namely that the Borrower has received approximately $6.5 million, upon which has accrued interest, most of which it will more than likely owe to the Secured Party at the end of the day.

Another way that the Borrower argues it can prevail is through its unclean hands defense. The Borrower argues, as we understand its brief, that the Secured Party is not a "holder in due course" of the notes; that the federal court in Georgia will apply Tennessee law despite the explicit choice of law provision in the notes; that a statute recently enacted in Tennessee will give the Borrower an unclean hands defense[1]; and that the unclean hands defense will apply to the Secured Party just as it would apply to Cornerstone because the Secured Party stands in Cornerstone's shoes. One problem with this argument is that the Borrower told the trial court in its complaint that it wants the merits determined in the federal action and now faults the trial court for not weaving its way through a series of detailed findings of fact and law to reach the conclusion that the Borrower will prevail. The case was not in a posture before the trial court, or before this court, for such detailed findings. What the trial court was charged with determining at this stage was the Borrower's likelihood of success. It concluded, correctly in our opinion, that the Borrower faces a long up-hill climb and that ultimately it will not be successful in eliminating the debt or asserting a successful and complete defense against foreclosure.

We can easily affirm the trial court's findings without exhaustively discussing each and every argument advanced by the Borrower. Unless the Borrower can successfully assert

---

[1]The Borrower relies on Tenn. Code Ann. § 16-1-203 (Supp. 2010). The language, in pertinent part, is as follows:

> If any person, or such person's predecessor-in-interest from whom the claim has derived, is found by the applicable trier of the fact in any court of competent jurisdiction to have unclean hands with respect to any claim, then such claim shall not be enforceable in such court, or any other court, unless the holder of such claim is a holder in due course of a negotiable instrument . . . .

Section 203 is part of the codification of the "equitable and common law defense of unclean hands." Tenn. Code Ann. § 16-1-201. A court "*may*" grant injunctive relief "in accordance with . . . applicable procedural rules and requirements . . . to maintain the status quo pending" determination of the merits of the unclean hands defense. Tenn. Code Ann. § 16-1-205 (emphasis added).

the unclean hands defense as a complete defense against payment of the loan and foreclosure under the deed of trust, then it will not prevail. Under Georgia law, which by the explicit terms of the note is to be applied to any dispute concerning the note, "[t]he equitable doctrine of unclean hands . . . has no application to an action at law." **Park v. Fortune Partner, Inc.**, 279 Ga. App. 268, 630 S.E.2d 871, 877 (2006)(omission in original). **Park** is consistent with the trial court's findings.

Even if the Borrower is successful in convincing the federal court to apply Tennessee law, there are limitations in Tennessee law upon application of the defense. In **Terrell v. Terrell**, 292 S.W.2d 179 (Tenn. 1956), the Court held that the fraud of grantee L.L. Terrell in a deed to Lucy Terrell could not be asserted as a defense by Lucy against her grantee Johnny because Johnny was "innocent of any wrong in the original transaction." 292 S.W.2d at 184. The trial court found that there is no proof before him that the Secured Party is guilty of fraud in the original transaction. We do not understand the Borrower to be challenging that finding; the Borrower is trying to avoid it by putting the Secured Party in Cornerstone's shoes.

Finally, even it the Borrower is successful in arguing that Tennessee substantive law applies to the determination of the amount owed on the note, and even if the Borrower is successful in arguing that the Secured Party can be subject to the defense based on the unclean hands of its grantee, the Borrower does not win automatically. "Decisions regarding the proper application of the doctrine of unclean hands are heavily fact-dependent and are addressed to the considerable discretion of the trial court." **Coleman Management, Inc. v Meyer**, 304 S.W.3d 340, 353 (Tenn. Ct. App. 2009). One factor that should weigh in the court's exercise of its discretion is whether the person who is pointing to the unclean hands of an opponent also has unclean hands. He who seeks equity must do equity. **Dodson v. Shrader**, 824 S.W.2d 545, 547 (Tenn. 1992). The trial court correctly pointed out in its findings in this case that "[i]t's not right for [the Borrower] to have gone almost two and a half years without paying any payment on the loans to [the Secured Party] . . ."

In summary, we find no error in the trial court's finding that the Borrower is unlikely to prevail at the end of the day. Also, we find no error in the trial court's finding that it is unlikely that foreclosure will work more harm on the Borrower than enjoining foreclosure would work on the Secured Party. There is also no error in the finding that foreclosure will not be against the public interest. We have considered all the Borrower's arguments to the contrary, including those we have not discussed in detail although listed in the issues, and find them to be without merit. The determinative issue is whether the trial court abused its discretion in dissolving the injunction. We have held that it did not. We have also held that the claim for injunctive relief is the only substantive claim ripe for adjudication. Because we

have found no error in dissolving the injunction, we need not reach the issue of what should be the terms of a bond posted upon continuation of the injunction.

V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Senior Housing Alternatives, Inc. This case is remanded, pursuant to applicable law for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE